*75-80 Properties, LLC et al. v. Rale, Inc. et al.*, No. 1689, Sept. Term, 2017.
Opinion by Arthur, J.

**STATUTORY INTERPERTATION – EX PARTE COMMUNICATIONS**

Md. Code (2014), § 5-859(b) of the General Provisions Article requires a member of
Frederick County's governing body who "communicates ex parte with an individual
concerning a pending application during the pendency of that application" to disclose the
communication. This statute requires the disclosure of any ex parte communication with
an individual, regardless of whether the individual is an applicant. Even if the
communication occurs during a public meeting, this statute requires disclosure when a
member of the governing body initiates a discussion with persons interested in a
proceeding, outside the record of the proceeding itself, and the comments reappear
without attribution in a document that is submitted as evidence in the matter before the
governing body.

**CONSTITUTIONAL RIGHTS – FIRST AMENDMENT**

A statute restricting ex parte communications with quasi-judicial decisionmakers does not
violate the First Amendment right to free speech. Restricting ex parte communications
between a quasi-judicial decisionmaker and an individual serves an important public
purpose of fostering public confidence in the fairness and integrity of the decision-
making process by ensuring that all interested persons have equal access to the
information on which the decision is based.

**ADMINISTRATIVE LAW – EXTREME CIRCUMSTANCES**

A finding of fraud or extreme circumstances in administrative proceedings is relevant
only when a party seeks to obtain discovery of an administrative decisionmaker's mental
processes in an action for judicial review.

**ADMINISTRATIVE LAW – CHANGE OF MIND DOCTRINE**

An administrative agency is typically prohibited from reversing an earlier decision solely
based on a "change of mind." An administrative agency has discretion to decide how to
proceed when the circuit court's remand order does not presume to determine what
proceedings were required by the agency.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1689

September Term, 2017

_____

75-80 PROPERTIES, LLC, ET AL.

v.

RALE, INC., ET AL.

_____

Meredith,
Arthur,
Beachley,

JJ.*

_____

Opinion by Arthur, J.

_____

Filed: August 29, 2019

* Judge Andrea M. Leahy did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Under a special statutory regime that governs certain administrative decisions affecting land use in Frederick County, a member of the County's governing body must disclose ex parte communications with any "individual" concerning a pending application, during the pendency of the application. If a court finds that a member of the governing body failed to disclose such a communication, the court must remand the case to the governing body for reconsideration.

In this complex and unusual case, the Circuit Court for Frederick County found that a former member of the Board of County Commissioners had engaged in an undisclosed ex parte communication regarding a pending application to rezone approximately 400 acres of land during the pendency of the application. The court remanded the case to the governing body, the new Frederick County Council, for reconsideration. On reconsideration, the County Council decided to require the applicants to recommence the process of applying for a change in zoning. When the applicants refused to submit a new application, the County Council asked the court to take such action as it deemed necessary to permit a new application to be heard. The court granted the Council's request, vacated the prior approvals, and remanded the case to the Council.

The applicants appealed. We shall affirm.

## BACKGROUND FACTS

In November 2012, Payne Investments LLC and 75-80 Properties LLC (collectively, the "Developers") filed an application for a zoning map amendment for more than 400 acres of land near the community of Monrovia in southeastern Frederick

County. The application requested that the land, which was zoned for agricultural purposes, be rezoned to permit a planned unit development or "PUD" with 1500 residential units. The development was to be called "Monrovia Town Center."

When they applied for the zoning map amendment, the Developers filed an application for a Development Rights and Responsibilities Agreement or "DRRA," under which the PUD zoning would remain in place notwithstanding any subsequent changes in the laws, regulations, or policies regarding the use of the real property or the density or intensity of the development on it. *See* Maryland Code (2012), § 7-304(a) of the Land Use Article. In addition, the Developers requested an Adequate Public Facilities Ordinance Letter of Understanding ("APFO LOU"), which would define the public facilities (such as road improvements and sewer facilities) that they would be required to construct to satisfy the requirements of Frederick County's Adequate Public Facilities Ordinance.

In November 2013, the Frederick County Planning Commission recommended the approval of the PUD and found that the draft DRRA was consistent with the County's Comprehensive Plan.

After three public hearings in January 2014, the Board of County Commissioners approved the PUD, subject to a number of conditions. The Developers accepted the conditions, and on March 28, 2014, the Planning Commission recommended the approval of a revised plan.

In April 2014, the Board of County Commissioners held a total of four public hearings concerning the PUD, the DRRA, and the APFO LOU for Monrovia Town

2

Center.  There was considerable public opposition to the proposed development, much of it focused on traffic safety and the adequacy of the local roadways.

On April 14, 2014, before the fourth and final hearing, Commissioner C. Paul Smith attended a public meeting of an organization called Frederick Area Committee for Transportation or "FACT."  FACT was composed of members of the Frederick County business community and representatives of local government.  It was formed to facilitate, support, and encourage transportation improvements in Frederick County.  Commissioner Smith was the Board of County Commissioners' representative on FACT's Advisory Board.  FACT's directors included Michael Smariga, a retired principal of the civil engineering firm that the Developers had engaged to pursue the application; Mr. Smariga's son was involved in pursuing the Developers' application.

At the FACT meeting, Commissioner Smith argued that the Developers' proposed improvements to the nearby highways (Routes 75 and 80) would benefit all residents in that area of the County.  The Commissioner's arguments later reappeared, without attribution, in a letter, on FACT letterhead, that was signed by FACT's secretary and sent to the Board of County Commissioners.

The Board of County Commissioners received the FACT letter by email at 2:41 p.m. on April 23, 2014, a little more than three hours before the beginning of the final public hearing on the Developers' application.  The email, from an employee of the Office of the County Manager, described the letter as "FACT's opinion."

Toward the end of the ensuing hearing, after 140 pages of testimony, the President of the Board of County Commissioners, Blaine Young, read the FACT letter into the

3

record and named its signatory (FACT's secretary, Michael Proffitt).  The President then read the names of each of the FACT directors (though not the names of the members of the Advisory Board, which included Commissioner Smith).  When Commissioner David Gray asked whether each of FACT's directors had signed the letter, the President responded that they had not, but that they had given their authority for the letter to be signed.

Although the FACT letter reiterated the arguments that Commissioner Smith had made at the FACT meeting nine days earlier, the Commissioner did not disclose that those arguments had originated with him.

Counsel for RALE, Inc., an organization that opposed the Developers' application, asked for an opportunity to cross-examine a representative of FACT.  The President responded that FACT was "not testifying," but was "submitting a letter."  He accepted the letter into evidence over RALE's objection.

When the hearing continued, the Developers presented their rebuttal case.  As part of that case, the Developers argued that "FACT might be the most apolitical organization in Frederick County," that "FACT doesn't care where or when land gets developed," and that "FACT cares strictly and solely about funding for transportation."
At the end of the hearing, the Board of County Commissioners voted to approve the PUD, the DRRA, and the APFO LOU by a vote of 4-1.  The Commissioners signed the operative documents on May 29, 2014.

On June 3, 2014, a few days after the PUD, the DRRA, and the APFO LOU took effect, a local newspaper reported that most of the FACT members, including its

4

president, had not seen the letter before it was sent; that Commissioner Smith had continued to discuss his arguments with Mr. Smariga after the FACT meeting ended; that two of FACT's directors drafted the letter at Commissioner Smith's request; that Commissioner Smith said that he had seen a draft version of the letter; and that the members of FACT did not vote on the correspondence or discuss its contents as a group. At about the same time, FACT submitted a second letter in which it backed away from the earlier letter, labelling it "public comment" that was "not to be considered evidence."

RALE and others filed a petition for judicial review of the approval of the PUD. In one argument in support of its petition, RALE pointed to some of the reported irregularities surrounding the FACT letter. In addition, RALE subpoenaed Commissioner Smith, Mr. Proffitt (the signatory of the FACT letter), and Ronald Burns (the County's traffic engineer) to testify at the hearing on the petition. The County and the Developers moved to quash the subpoenas.

At a hearing on the motion to quash on January 26, 2015, RALE argued that under *Public Service Comm'n v. Patuxent Valley Conservation League*, 300 Md. 200, 214 (1984), it may take testimony about an administrative decisionmaker's mental processes if it can make a strong showing of fraud or extreme circumstances that occurred outside the scope of the administrative record. RALE also argued, among other things, that Commissioner Smith had "orchestrated" the creation of the FACT letter – i.e., that he had participated in the creation of evidence in an administrative proceeding in which he was one of the quasi-judicial decisionmakers. In an order dated January 27, 2015, the circuit

5

court granted the motion to quash the subpoenas on Mr. Proffitt and Mr. Burns, but denied the motion to quash the subpoena on Commissioner Smith.

The County, the Developers, and Commissioner Smith moved the court to reconsider the order denying the motion to quash, while RALE moved the court to remand the case to the newly constituted Frederick County Council.[1]  In support of its motion to remand, RALE relied on Md. Code (2014), §§ 5-857 to -862 of the General Provisions Article ("GP"), the special provisions for Frederick County in the Maryland Public Ethics Law.  In particular, RALE argued that Commissioner Smith had engaged in undisclosed ex parte communications concerning the Developers' application, in violation of GP § 5-859(b).[2]  Consequently, RALE argued, the court was required to "remand the case to the governing body for reconsideration."  GP § 5-862(b).

After a hearing on March 10, 2015, the circuit court issued an order in which it remanded the Developers' application and the related approvals to the County Council. The court based its order on the following findings:

---

[1] Frederick County became a charter county, with a County Executive and a County Council rather than a Board of County Commissioners, on December 1, 2014.

[2] At the time of the communication, the governing statute was actually Md. Code (1984, 2009 Repl. Vol.), § 15-855(b) of the State Government Article, which provided that "[a] Board member who communicates ex parte with an individual concerning a pending application during the pendency of the application shall file with the County Manager a separate disclosure for each communication within the later of 7 days after the communication was made or received."  As of December 1, 2014, the prohibition on certain undisclosed ex parte communications, and other, related measures pertaining to Frederick County, were transferred without substantive change to the General Provisions Article.  Because the Frederick County Council has now replaced the Board of County Commissioners, GP § 5-859(b) currently requires "[a] member of the governing body" to disclose certain ex parte communications.

6

1)      That Commissioner Smith attended the April 14, 2014 FACT Committee meeting;

2)      That Commissioner Smith commented on [the Developers'] pending zoning application, as reflected in the April 14, 2014 FACT Committee Meeting Minutes;

3)      That [GP § 5-859(b)] states: "A member of the governing body who communicates ex parte with an individual concerning a pending application during the pendency of the application shall file with the Chief Administrative Officer a separate disclosure for each communication within the later of 7 days after the communication was made or received," and therefore requires disclosure of such communications;

4)      That pursuant to the Public Ethics 2014 Annual Report to the Frederick County Ethics Commission, wherein the [Board of County Commissioners] discloses ex parte communications, Commissioner Smith's comments were not disclosed;

5)      That the FACT committee incorporated the information from Commissioner Smith into its April 23, 2014 letter to the [Board of County Commissioners];

6)      That the FACT letter was presented to the Commissioners with the intent to influence the pending vote;

7)      That the FACT letter was read into the record at the end of testimony by [Board of County Commissioners] President, Blaine Young, which is highly suggestive that the [Board] relied on it.

The court went on to say that it could not make a judgment about whether the record supported the decision to approve the PUD, because the FACT letter, its timing, and the potential that the Board members had relied on it "form[ed] an integral part of the record."

The court remanded the matter to the County Council, as the successor to the Board of County Commissioners, "for further proceedings, including testimony, to resolve the issues raised in [its] Opinion." At the same time, the court quashed the

7

subpoena on Commissioner Smith, presumably because no further circuit court proceedings were in the offing. The court did not dismiss the case.[3]

On remand, the Council asked former Commissioners Smith, Young, and Gray to submit affidavits regarding "their position on the significance of the FACT correspondence on the case." Commissioner Gray, who cast the sole vote against the application in 2014, wrote that the letter "with the letterhead of FACT had no affect [sic] on [his] vote" and that "[i]ts source was suspect and its validity in question." Commissioner Young, on the other hand, stated that he would have voted to approve the application even if the FACT letter had not been introduced. Similarly, the two councilmembers who had also been County Commissioners in 2014 told their new colleagues that the FACT letter did not affect their decision.

Commissioner Smith declined the Council's request that he submit an affidavit concerning the significance of the FACT letter. Citing the threat of criminal

---

[3] In its brief, RALE points out that at a hearing on May 29, 2014, when the Board of County Commissioners signed the rezoning approval for the Monrovia Town Center site, Commissioner Smith publicly acknowledged that he "did request" that FACT "weigh in on this" and that he "was glad they did." At another point, the Commissioner stated: "[C]omments were made at the hearing of how important the letter was, and I was glad that it was there, and I requested it." The hearing of May 29, 2014, including Commissioner Smith's comments, was recorded on video and is available on Frederick County's website. *See* https://frederick.granicus.com/MediaPlayer.php?view_id=8&clip_id=4363 (beginning at 44:24). For reasons that are not apparent, no one appears to have informed the circuit court of Commissioner Smith's public admission that he asked FACT, or a FACT representative, to create "important" evidence in a case in which he himself was one of the decisionmakers. The proceedings of the Board of County Commissioners are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Md. Rule 5-201(b)(2). Consequently, we can and do take judicial notice of Commissioner Smith's public comments about the origins of the FACT letter.

8

prosecution,[4] Commissioner Smith instead submitted a five-page letter in which he refrained from denying any of the factual allegations concerning the provenance of the FACT letter, but argued that a restriction on ex parte communications by a quasi-judicial decisionmaker would violate his First Amendment rights. Commissioner Smith proceeded to address, at some length, other issues that the Council had not asked him to address.

The Council held two public hearings in June 2015. In connection with the hearings, the Council received lengthy written submissions from RALE and from the attorneys for the Developers. Additionally, the Council heard from members of the public, some of whom reiterated the published reports that former Commissioner Smith had asked one or two of the FACT directors to submit the letter on FACT's behalf and that the directors of FACT had not authorized the letter (notwithstanding the representation by the Board President at the hearing at which the PUD was approved). Perhaps because of limitations on the Council's subpoena power,[5] it did not compel testimony from Commissioner Smith, Mr. Smariga, Mr. Proffitt, FACT's president, or

---

[4] Under GP § 5-862(b)(1), a knowing and willful violation of the restriction on ex parte communications is a misdemeanor.

[5] Section 211 of the Frederick County Charter states that, in investigating "the affairs of the County and the conduct and performance of any Agency," the Council may issue a subpoena "to any current County employee, County agency or department, or contractor doing business with the County upon the affirmative vote of at least six council members." Assuming that the remand entailed an investigation of "the affairs of the County," the Council still could not issue a subpoena without the approval of a supermajority of its members (six of seven). Even then, it appears that the Council could issue a subpoena only to current employees, agencies, or departments, or to contractors doing business with the County.

other persons who might have personal knowledge of how the FACT letter came about. None of those persons came forward voluntarily to explain how Commissioner Smith's arguments coincidentally reappeared in a letter that was presented as FACT's opinion, or to explain why FACT backed away from that characterization after the PUD was approved.[6]

On September 1, 2015, Councilmember Keegan-Ayer "moved to send the entire matter back to the Frederick County Planning Commission (PC) to begin again, because at this time it is not possible to reconcile the affidavits and statements made and submitting to the Council with respect to [the FACT letter] and its alleged influence on the previous Board of County Commissioners' decision with the actions, statements, and behavior surrounding the letter; its inception; its creation; its phraseology; its timing and its introduction and handling once it was introduced[.]" The motion envisioned that the Planning Commission would report back in six months or less and that, if possible, the Developers' fees would be waived. The motion passed by a vote of 4-3.

The Developers declined to begin the process anew and to return to the Planning Commission, contending that they had vested rights in the prior approvals. Consequently, on February 7, 2017, the County Council, in a 4-3 vote, adopted what it

---

[6] Again, no one appears to have informed the County Council of Commissioner Smith's public acknowledgement, at a meeting of the Board of County Commissioners on May 29, 2014, that he "did request" that FACT "weigh in on" the Developers' application and that he "was glad they did." *See supra* n.3. The two councilmembers who had been Commissioners in 2014 would, however, have witnessed Commissioner Smith's acknowledgment.

10

called its "Post Remand Conclusions." The substantive portion of the resolution began with the following conclusions:

> Other than the statements submitted by the former County Commissioners, the testimony and exhibits presented to the County Council during the hearings were consistent with [the circuit court's] findings regarding former Commissioner Smith's ex parte activities: attending the April 14, 2014, Frederick Area Committee for Transportation (FACT) Committee meeting; commenting during that meeting about the [Monrovia Town Center] pending applications; [and] failing to disclose those ex parte communications as required by law; which led to the preparation of the FACT letter dated April 23, 2014, and its presentation to the Board of County Commissioners (BOCC) near the conclusion of its hearing with the intention to influence the upcoming vote; [and] the reading into the record of the letter by the then Board President at the end of the testimony.

The Council also concluded that "[t]he aggregate of information reveals extreme irregularity surrounding the FACT letter." In support of that conclusion, the Council cited "the timing of its presentation," its "handling by the BOCC President during the hearing, and the emphasis placed on this 'last minute' document during the applicant's rebuttal" case. The Council added that at the time of the hearing "the FACT committee had been viewed as knowledgeable and influential in the area of Frederick County transportation matters." But although "[i]t was represented by the BOCC President during the hearing that the whole FACT committee had approved the letter," it was later "revealed that the FACT letter had been generated by only two of the Committee members, one of whose son and former company represented and performed services for the [Monrovia Town Center] applicants before and during the BOCC hearings." Furthermore, the Council observed that Commissioner Smith "did not testify during the Council hearings nor did he submit sworn testimony," as he had been requested to do.

11

For purposes of determining how to proceed on remand, the Council remarked that the testimony "revealed additional inconsistencies and irregularities relating to the crucial issue of the adequacy of the transportation network in the area." County law, the Council wrote, requires findings on that issue.

Because the Developers had declined to return to the Planning Commission and had said that they would oppose any effort to reconsider the approval of the PUD, the DRRA, and the APFO LOU, the Council concluded that it had "done what it can to fully comply with the Remand Order." It asked the circuit court to "take such action as it deems necessary and appropriate so that the County Council may rehear the [Monrovia Town Center] application."[7]

After hearing legal argument, the circuit court issued an order on September 29, 2017, in which it vacated the approval of the PUD and the two agreements whose viability depended upon the PUD – the DRRA and the APFO LOU. In the accompanying opinion, the court found, again, that Commissioner Smith had engaged in an undisclosed ex parte communication, in violation of § 5-859(b). "[B]ecause of its timing," the court wrote, the ex parte communication was "deceitful to the Government

---

[7] In their brief, the Developers argue that the County lacks standing to participate in an action for judicial review of a determination by its quasi-judicial decisionmakers. The Developers, however, do not appear to have raised that objection when the County asked the circuit court to vacate the PUD and to require to the Developers to return to the Planning Commission. In any event, in the unusual procedural posture of this case, in which the County Council on remand was unable to enforce its determination that the Developers should begin the process anew, the County was effectively required to intervene in the proceedings in order to ask the court to end the administrative stand-off.

12

as well as the public." In the court's view, the Commissioner's "breach of ethics" could "not be overlooked."

The court concluded that the FACT letter, which was engendered by the ex parte communication, was a substantial factor in the approval of the PUD:

> In analyzing the FACT letter's significance, it is necessary to discuss the mission of FACT as well as the contents and timing of the letter. FACT is devoted to advocating for major transportation issues in Frederick County. FACT's opinion is relied upon by various governing bodies in Frederick County, including the Board of Commissioners[,] as a neutral, unbiased agency. Commissioner Smith inserted his opinion into FACT's decision making process and subsequently failed to disclose his involvement. FACT's use of Commissioner Smith's opinion without attribution tainted its assessment. Furthermore, transportation concerns remained a major issue during various meetings pending approval of the [PUD]. The FACT letter, as read into the Board of Commissioners' hearing record, addresses the potential traffic issues. The letter also argues [for] the 'large benefits from the approval of the [PUD]." By citing only positive outcomes of approval of the project, the FACT letter was introduced to sway the Commissioners' votes toward approval of the project and dissuade the community's fears of the pending project.[8]

The court added that the timing of the letter "increase[d] its propensity to influence a Commissioner's vote." "[T]he lack of attribution in the FACT letter," the court said again, "was intended to deceive not only members of the Board but the public at large." "The deception surrounding the FACT letter," the court wrote, "is not remedied by [the] two affidavits" from the former Commissioners.

Because the record remained incomplete even after the remand, the court could not definitively assess the true impact of the FACT letter. Thus, finding itself unable to

---

[8] The context suggests that the court may have meant that the letter was introduced to "allay" or "assuage" the community's fears.

determine whether the commissioners had acted properly in approving the PUD, the court relied on *People's Counsel for Baltimore Cnty. v. Country Ridge Shopping Center*, 144 Md. App. 580, 593 (2002), for the proposition that, it "should remand to the agency for further proceedings."

The Developers opposed a remand that would require them to begin the application process again before the Planning Commission. They argued that they had vested rights in the DRRA. The court rejected that argument, reasoning that the governing body's violation of the rules of ethics in GP § 5-859 "prevents the enforcement of the DRRA."

In an accompanying order, the court remanded the case to the County Council and vacated the PUD, the DRRA, and the APFO LOU. The Developers appealed, as did Commissioner Smith.[9]

---

[9] It is unclear how Commissioner Smith has the right to be heard in this appeal. In the court below, the action for judicial review entailed RALE's challenge to the approval of the PUD and, after the County Council's decision on remand, its request that the court take such action as it deemed necessary and appropriate to permit the Council to re-hear the application. Commissioner Smith was never a party to any facet of that proceeding, except in regard to his ultimately successful effort to quash a subpoena for his testimony (which is not a point he argues in his brief in this Court). Nonetheless, neither RALE nor the County have challenged Commissioner Smith's right to file a brief. Nor did they notice that he failed to file a notice of appeal until November 6, 2017, 34 days after the entry of the final judgment. *See Rosales v. State*, 463 Md. 552, 568 (2019) (holding that Rule 8-202(a)'s 30-day deadline for noting an appeal is not jurisdictional and that an appellee may waive the right to object to an untimely notice of appeal). In fact, the County appears to have taken advantage of Commissioner Smith's appeal to file two briefs and thus to exceed the number of words that would otherwise be allotted to it under Rule 8-503(d). In these circumstances, we shall consider the Commissioner's arguments as if they were those of an amicus.

14

The Developers present two questions, which we have rephrased slightly for concision:

1. Did the circuit court err in finding that Commissioner Smith's appearance at a public meeting was an ex parte communication that had to be noted on a log pursuant to GP § 5-859(b)?

2. On petitions for judicial review, did the circuit court err in failing to consider the entirety of the record?[10]

Commissioner Smith presents three questions, which we have also rephrased for concision:

1. Did § 5-859 require Commissioner Smith to file a disclosure of public statements made at a public meeting before a quasi-public organization at County headquarters?

2. Does § 5-859, as applied by the circuit court, violate Commissioner Smith's First Amendment rights?

3. Did the circuit court erroneously conclude that Commissioner Smith's conduct constituted "extreme circumstances"?[11]

---

[10] The Developers formulated their questions as follows:

I.      Whether the circuit court erred in finding that Commissioner Smith's appearance at a public meeting was an *ex parte* communication that had to be noted on a log pursuant to Maryland Code, General Provisions Section 5-859(b)?

II.     Whether, on petitions for judicial review, the circuit court erred in failing to consider the entirety of the record?

[11] Commissioner Smith formulated his questions as follows:

I.      Whether Section 5-859 required Commissioner Smith to file a disclosure of public statements made at a public meeting before a quasi-public organization at County headquarters?

For the reasons discussed below, we see no error or abuse of discretion. Consequently, we shall affirm the judgment below.

## DISCUSSION

**I.    Did Commissioner Smith Engage in an Ex Parte Communication?**

Both the Developers and Commissioner Smith challenge the circuit court's conclusion that the Commissioner engaged in an ex parte communication that he was required to disclose under GP § 5-859(b). Their challenge involves a question of statutory interpretation. Whether the circuit court correctly interpreted a statute is a question of law that we review de novo. *See Beall v. Holloway-Johnson*, 446 Md. 48, 76 (2016).

"When we construe a statute, we search for legislative intent." *Bell v. Chance*, 460 Md. 28, 53 (2018). "Consideration of the statutory text in context is our primary guide." *Id.* "'Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity.'" *Blue v. Prince George's County*, 434 Md. 681, 689 (2013) (quoting *Town of Oxford v. Koste*, 204 Md. App. 578, 585-86 (2012), *aff'd*, 431 Md. 14 (2013)) (further citations omitted). Where the words of the statute are clear and

---

II.    Whether, as applied by the Circuit Court, Section 5-859 violates Commissioner Smith's First Amendment rights?

III.    Whether the circuit court erroneously concluded that Commissioner Smith's conduct constituted "extreme circumstances."

16

unambiguous, there usually is no need to go further in construing it. *See*, *e.g.*, *Harris v. State*, 331 Md. 137, 145-46 (1993).

At various points, the Developers argue that the circuit court erroneously interpreted § 5-859(b) to mean that Commissioner Smith engaged in an ex parte communication merely because he attended the FACT meeting. We disagree that the court read the statute so broadly. In ordering the initial remand, the court observed that Commissioner Smith not only attended the meeting, but also that he "commented" on the pending application; that his comments somehow found their way into the FACT letter, which was presented to the Commissioners "with the intent to influence the pending votes"; that he did not disclose that his comments had engendered the FACT letter; and that the Board's President read the letter into evidence at the end of the testimony, which suggested that the Board relied upon it. Moreover, in vacating the PUD approval and the related approvals, the court specifically stated that it did not take issue with Commissioner Smith's mere attendance at the meeting or his participation in it. The court did not confuse "attendance" with "communication."

In a variant on the Developers' argument, Commissioner Smith asserts that he could not have engaged in an ex parte communication at the FACT meeting, because the meeting was open to the public. We disagree. Commissioner Smith's communications with FACT were ex parte because they concerned a pending quasi-judicial proceeding in which he was one of the decisionmakers, but were not part of the record of that proceeding. *See* 5 U.S.C. § 551(14) (generally defining the term "ex parte communication," in the Administrative Procedure Act, to mean "an oral or written

17

communication not on the public record with respect to which reasonable prior notice to all parties is not given"). The Developers' adversaries had no notice that Commissioner Smith would use the meeting as an opportunity to express his views about the proceeding and, one can infer, to elicit support from FACT. The Developers' adversaries certainly had no notice that the Commissioner's views would reappear in a letter on FACT letterhead, which came into evidence in the proceeding itself. On the other hand, at least one member of FACT was associated with the Developers. In these circumstances, the public nature of the proceeding did not absolve Commissioner Smith's communications of their ex parte character.

Commissioner Smith cites cases from other jurisdictions, which, he says, stand for the proposition that statements at a public meeting are not ex parte communications. The cases do not support that proposition. In *North v. United States Dep't of Justice*, 17 F. Supp. 3d 1, 3-4 (D.D.C. 2013), the court reached the uncontroversial conclusion that it itself did not engage in an ex parte communication when it issued a public order directing one party to address flaws or deficiencies in its filings. In *Citizens of the State of Florida v. Wilson*, 569 So.2d 1268, 1269 (Fla. 1990), the court held that, when an agency's staff members made recommendations at a public hearing before the very agency that was charged with deciding an administrative proceeding, they did not violate a statutory prohibition on engaging in ex parte communications with a hearing officer about a recommended order. Finally, in *City of Hollywood v. Hakanson*, 866 So.2d 106, 107 (Fla. Dist. Ct. App. 2004), the court held that an administrative decisionmaker did not have a statutory duty to disclose ex parte communications merely because he had

18

attended a public meeting at which a participant had made critical comment about the plaintiff. These cases do not exempt a quasi-judicial decisionmaker from a restriction on ex parte communications when he initiates a discussion with persons interested in a proceeding before him, outside the record of the proceeding itself, and his comments reappear (without attribution) in a document that is submitted as evidence in the case that he is to decide.[12]

The Developers go on to argue that Commissioner Smith did not engage in an ex parte communication, within the meaning of the statute, because he did not communicate with a party to the proceeding before him or with a party's representative. Similarly, Commissioner Smith argues that the statute applies only to communications with an "applicant" for quasi-judicial relief. Both the Developers and the Commissioner have read the statute too narrowly.

By its terms, § 5-859(b) requires the disclosure of ex parte communications "with an *individual* concerning a pending application." (Emphasis added.) Had the General Assembly intended to confine the statute's scope to communications with an "applicant" or a "party," it could have done so, as it has in another instance. *See*, *e.g*., GP § 5-836(a) (requiring the disclosure of an "ex parte communication concerning a pending application between an *applicant or applicant's agent* and a member [of the Prince George's County

---

[12] Commissioner Smith also cites an unpublished decision from a federal trial court, *Theriot v. Bates*, No. 2:12-CV-200, 2012 WL 2523412 (W.D. Mich. June 29, 2012). It is, however, "the policy of this Court in its opinions not to cite for persuasive value any unreported federal or state court opinion." *Kendall v. Howard County*, 204 Md. App. 440, 445 n.1 (2012), *aff'd*, 431 Md. 590 (2013); *accord Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 718 n.10 (2015).

Council] or the [Prince George's] County Executive") (emphasis added). Because the

General Assembly unambiguously chose not to limit the Frederick County ethics law to

ex parte communications with "applicants" or "parties," we reject the contention that the

statute did not apply to Commissioner Smith's communications with other "individuals,"

such as FACT's representatives.[13]

The Developers and Commissioner Smith cite the legislative history of the

Frederick County ethics law to argue that it was intended only to protect against *quid pro

quo* corruption – a concern that, they say, is inapplicable in this case. Ordinarily, we do

not consider legislative history when the language of a statute itself is unambiguous, as it

is here. *See*, *e.g.*, *State v. Bey*, 452 Md. 255, 266 (2017). But even if we considered the

two aspects of legislative history that the Developers and Commissioner Smith have

cited, our conclusion would not change.

The Developers and Commissioner Smith first cite a letter dated May 4, 2007, in

which the Attorney General wrote to the Governor about the constitutionality of one

provision of the legislation that became the Frederick County ethics law – the provision,

in what became GP § 5-858(b), that prohibited a board member from voting or

---

[13] The Developers cite the definition of "ex parte" in *Black's Law Dictionary* 697 (10th ed. 2014): "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, anyone having an adverse interest[.]" On the basis of that definition, they argue that an ex parte communication "generally requires a communication with a party," which did not occur in this case. We agree that the *Black's* definition accurately describes one type of ex parte communication. We disagree, however, that the *Black's* definition exhausts the universe of ex parte communications that are covered by § 5-859(b). By its literal terms, § 5-859(b) restricts ex parte communications with "individual[s]," including individuals who may be interested in the outcome of the proceeding, but who are not parties themselves.

participating in the proceedings concerning an application if the member or the member's political action committee had received a contribution from the applicant during the pendency of the application. In concluding that the proposed legislation did not violate the free speech guarantees of the federal or state constitutions, the Attorney General reasoned that it "serve[d] a substantial government interest by taking aim at a discreet [sic] class of contributors whose political activity raises concerns of *quid pro quo* corruption (or its appearance) and conflicts of interest on the part of incumbent office holders/zoning decision-makers."

Citing the reference to "*quid pro quo* corruption (or its appearance) and conflicts of interest" in the Attorney General's letter, the Developers argue that it would not further the objectives of § 5-859 to conclude that Commissioner Smith's communications fell within the scope of the statute. The short answer to that contention is the Attorney General's letter addressed only one provision of the proposed legislation: it did not address the restriction on ex parte communications with "individual[s]," and it neither stated nor implied that the sole purpose of the legislation as a whole was to address the problem of "*quid pro quo* corruption (or its appearance) and conflicts of interest."[14]

In a second appeal to legislative history, the Developers and Commissioner Smith cite the Department of Legislative Services' fiscal note to the 2007 legislation that became the Frederick County ethics law. According to the fiscal note, the legislation

---

[14] In any event, a quasi-judicial decisionmaker arguably would have a species of "conflict of interest" if, through an ex parte communication, he procured evidence in case that he was called to upon to decide.

21

"require[s] disclosure of *ex parte* communications between a Frederick County Commissioner and an *applicant* while an application is pending."

https://perma.cc/2ZXH-3XW3 (emphasis added); https://perma.cc/QT4P-X8ZM (emphasis added). The Department of Legislative Services, however, has no power to amend legislation to make it mean something other than what it literally says. *See, e.g.*, *Duffy v. CBS Corp.*, 458 Md. 206, 229 (2018) ("resort to legislative history . . . is not undertaken to seek contradiction of the plain meaning of the statute") (further citation and quotation marks omitted). The legislation in this case pertains to communications between a commissioner and an *individual*, and not merely an *applicant*. To the extent that the Department of Legislative Services interpreted the statute otherwise, it was wrong.

In summary, the circuit court did not err in concluding that the statutory restriction on certain ex parte communications applied to Commissioner Smith's interactions with FACT.

## II.    Does GP § 5-859(b) Violate the First Amendment?

Commissioner Smith contends that, in prohibiting him from engaging in undisclosed ex parte communications concerning a zoning application in which he was involved as a quasi-judicial decisionmaker, § 5-859(b) violated his First Amendment right to freedom of speech. The Developers endorse his contention. The circuit court rejected that contention. Applying a de novo standard of review (*see*, *e.g.*, *Schisler v. State*, 394 Md. 519, 535 (2006)), so do we.

22

Restrictions on ex parte communications with judges and quasi-judicial decisionmakers are common in Maryland[15] and throughout the United States.[16]  Yet Commissioner Smith can cite no case in which any court has held that the First Amendment prohibits such a restriction.  In fact, our research has disclosed no case in which a judge or quasi-judicial decisionmaker has had the temerity to argue that he or she has a First Amendment right to engage in undisclosed ex parte communications concerning a pending matter.  The reason is obvious: restrictions on ex parte communications by judges and quasi-judicial decisionmakers serve the important public purpose of fostering public confidence in the fairness and integrity of the decisional

[15] *See*, *e.g.*, Md. Rule 18-102.9(a) (generally prohibiting a judge from initiating, permitting, or considering ex parte communications or from considering communications made to the judge out of the presence of the parties or their attorneys, concerning a pending or impending matter); Md. Code (1984, 2014 Repl. Vol.), § 10-219(a)(1) of the State Government Article (generally prohibiting a presiding officer in a proceeding under the Maryland Administrative Procedure Act from communicating ex parte regarding the merits of any issue in the case, while the case is pending, with a party, a party's representative, or a party's attorney, or any person who presided at a previous stage of the case); GP § 5-836 (generally requiring disclosure of certain ex parte communications with the Prince George's County Executive or members of the Prince George's County Council concerning a pending application for a change in rules governing the use of a property); *see also* Md. Rule 19-303.5(a)(7) (generally prohibiting an attorney from communicating ex parte about an adversary proceeding with the judge or other official before whom the proceeding is pending).

[16] *See*, *e.g.*, ABA Model Rule of Judicial Conduct 2.9(A) (generally prohibiting a judge from initiating, permitting, or considering ex parte communications or from considering communications made to the judge out of the presence of the parties or their attorneys, concerning a pending or impending matter); 8A *McQuillin on Municipal Corporations*, § 25.284 (3d ed. July 2018 update) (collecting authorities regarding restrictions on ex parte communications with quasi-judicial decisionmakers); *see also* ABA Model Rule of Professional Conduct 3.5 (generally prohibiting an attorney from communicating ex parte about an adversary proceeding with the judge or other official before whom the proceeding is pending).

process by ensuring that all interested persons have equal access to the information on which the decision is based. Those restrictions do not violate the First Amendment. *Cf. Schoenbohm v. FCC*, 204 F.3d 243, 248-49 (D.C. Cir. 2000) (holding that an agency's prohibition on ex parte communications did not violate a litigant's First Amendment right to urge others to communicate off-the-record with the agency); *Iowa Supreme Court Att'y Disc. Bd. v. Doe*, 878 N.W.2d 189, 196 (Iowa 2016) (holding that the First Amendment did not protect ex parte communications to a judge in which an attorney allegedly violated disciplinary rules by making false and unreasonable allegations of unethical conduct); *In re McCool*, 172 So. 3d 1058, 1075-78 (La. 2015) (holding that the First Amendment did not protect a lawyer from sanctions for waging an online campaign in which she encouraged others to engage in ex parte communications with the judges presiding over her client's case).

In contending that the statute violates the First Amendment, Commissioner Smith asserts that, as a legislator, he had a right and duty to speak on legislative matters. Of course, the statute did not actually prohibit the Commissioner from speaking about anything: it merely required him to disclose ex parte communications concerning certain land-use disputes that were pending before him as a quasi-judicial decisionmaker. In any event, in stressing his rights and duties as a legislator, the Commissioner misapprehends his role in considering the Developers' application.

Although Commissioner Smith was an elected member of what was then the County's legislative and executive body, he and his fellow commissioners were functioning as quasi-judicial decisionmakers when they considered the Developers'

24

application to rezone its property. *Maryland Overpak Corp. v. Mayor & City Council of Baltimore*, 395 Md. 16, 37 (2006) ("proceedings or acts that scrutinize individual parcels or assemblages for the consideration of property-specific proposed uses, at the owner's or developer's initiative, ordinarily suggest a quasi-judicial process or act"); *see also Mayor and Council of Rockville v. Woodmont Country Club*, 348 Md. 572, 584 (1998) (holding that, "where the Council was holding a hearing, receiving written and oral testimony, and considering evidence to determine the specific amount of special benefit to a particular piece of property, the Council at that point was acting in a quasi-judicial capacity"); *Armstrong v. Mayor & City Council of Baltimore*, 169 Md. App. 655, 670 (2006) (holding that an ordinance authorizing a conditional use was "adjudicative in nature" because "[t]he focus of the hearing was on a single piece of property and the effect of its development on surrounding properties"); *compare Kenwood Gardens Condos., Inc. v. Whalen Props., LLC*, 449 Md. 313, 332 (2016) (holding that the passage of a resolution that allowed for the continued review of a PUD proposal was a legislative act because it was "premised on a threadbare recital of relevant facts as submitted by the developer and evaluated on general, policy-based grounds"). Accordingly, § 5-859(b) did not impinge upon the Commissioner's rights and duties as a legislator.

Finally, Commissioner Smith argues that § 5-859(b), as construed by the circuit court, is unconstitutionally vague. He asserts that if public statements at public meetings are ex parte communications, then any communication could be an ex parte communication. In this case, however, the court did not find that Commissioner engaged in undisclosed ex parte communications solely because he made public statements at a

25

public meeting. Rather, the court found that he engaged in undisclosed ex parte communications because he made arguments in favor of an application that was currently pending before him as a quasi-judicial decisionmaker; because his arguments were repackaged, without attribution, in a letter that was then submitted as evidence in the very case that he was to participate in deciding; because he thereby inserted himself into the decisional processes of a supposedly neutral expert board; and because he did not disclose that the arguments originated with him.

In our judgment, persons of ordinary intelligence could discern that § 5-859(b) required them to disclose that they had engaged in such communications. Therefore, the statute is not unconstitutionally vague. *See*, *e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

**III.    Is There an Adequate Factual Basis for the Vacatur Order?**

The Developers argue that the vacatur order – the order by which the court vacated the PUD and the related agreements – is unsupported by record evidence. In reviewing that argument, "[o]ur task is limited to deciding whether the circuit court's factual findings were supported by substantial evidence in the record." *L.W. Wolfe Enters., Inc. v. Maryland Nat'l Golf, L.P.* 165 Md. App. 339, 343 (2005). In deciding whether the findings are supported by substantial evidence, we must view the evidence in a light most favorable to the prevailing party. *Id.* "'If there is any competent and material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *Id.* (quoting *Yivo Institute for Jewish Research v. Zaleski*, 386 Md. 654, 663 (2005)).

26

Under this forgiving standard, we cannot conclude that the circuit court lacked an adequate factual basis for the findings on which it based the vacatur order. There is no serious question that Commissioner Smith attended the FACT meeting and deployed a number of arguments in favor of the Developers' application; that his argument mysteriously reappeared, without attribution, in a letter from FACT; and that he failed to disclose that the arguments in the letter, from a board of supposedly neutral experts, had originated with him. The Commissioner's invocation of his Fifth Amendment privilege against self-incrimination and his refusal to cooperate with the Council's investigation provide further inferential support for a finding that the FACT letter was the product of an ex parte communication. *See Whitaker v. Prince George's County*, 307 Md. 368, 386 (1986).

In view of these facts, it would not be unreasonable to infer that Commissioner Smith had procured evidence in a proceeding that was pending before him as a quasi-judicial decisionmaker.[17] The circuit court, therefore, was by no means clearly erroneous in concluding that "the lack of attribution in the FACT letter was intended to deceive not only members of the Board, but the public at large."

The Developers complain that the court did not adequately explain why the timing of the FACT letter was significant. We think that the significance is self-evident. The FACT letter materialized hours before the final public hearing on a hotly contested zoning application. The letter was deployed near the end of the hearing, after the

---

[17] In fact, because of Commissioner Smith's public comments outside the record in this case, we know that he asked for the letter. *See supra* n.3.

27

opponents of the application had closed their case. The opponents were not permitted to question the letter's author or a representative of FACT. The Board's President assured a dubious colleague that the letter had been authorized by each of the FACT directors, yet FACT later distanced itself from the letter, asserting that it was not intended as evidence. Meanwhile, in rebuttal, the Developers' attorney touted the letter as evidence from an unbiased, apolitical expert board. The court was not clearly erroneous in concluding that "the FACT letter's timing increase[d] its propensity to influence a Commissioner's vote."

The Developers also complain that the court ignored the statements of several Commissioners that the letter had no effect on their votes and that the court "baldly concluded" that "[t]he deception surrounding FACT letter is not remedied by two affidavits" from two former Commissioners. The Developers have not accurately characterized the court's opinion. From our reading of the opinion, it is apparent that the court struggled with the difficult question of how to reconcile the assertions that the FACT letter had no impact on the Board's decision with its recognition that the decision came immediately after the last-minute introduction of key evidence that was secretly procured by one of the decisionmakers himself. In concluding that the FACT letter was "a substantial factor" in the Commissioners' decision, the court appears to have been searching for a diplomatic way to say that it did not completely credit the testimony of some of the former Commissioners – i.e., to say that they had an incentive to minimize the import of the FACT letter because they did not want their decision to be reconsidered, and possibly changed. The court was not required to credit the former Commissioners' testimony.

28

**IV.    Was There an Adequate Factual Basis for the Initial Remand?**

Proceeding in reverse chronological order, the Developers argue next that the circuit court erred in ordering the initial remand in 2015.  Under the deferential scope of review that we are required to employ (*see supra* Section III), we reject their argument.

Citing *Montgomery County v. Stevens*, 337 Md. 471, 481 (1995), the Developers begin by arguing that the court erred in remanding the case because, they say, RALE did not make "a strong showing of fraud or extreme circumstances outside of the administrative record."  The Developers misapprehend the basis for the remand.  The requirement of "fraud or extreme circumstances outside of the administrative record" applies only when a party seeks to obtain discovery of an administrative decisionmaker's mental processes in an action for judicial review.  *See id*.  A court, however, need not find "fraud or extreme circumstances outside of the administrative record" before ordering a remand under the Frederick County ethics law.  Instead, under GP § 5-862(a)(2), "the court shall remand the case" if it finds a violation of the ethics law, such as an undisclosed ex parte communication.  The circuit court did what the statute required it to do.[18]

The Developers also argue that, in advocating for the initial remand, RALE relied on inadmissible hearsay in the form of a newspaper article concerning Commissioner Smith's role in the genesis of the FACT letter.  Of course, it is unsurprising that RALE

---

[18] RALE did attempt to obtain testimony from Commissioner Smith in connection with the action for judicial review, and the court initially indicated that it would permit RALE to do so when it denied the Commissioner's motion to quash.  After remanding the case, however, the court reconsidered its decision and granted the motion to quash.

would have to resort to hearsay, because RALE was precluded from cross-examining a FACT representative when the letter first surfaced at the public hearing, and because the questions about the letter's provenance did not come to light until after the administrative record was closed. Nonetheless, the circuit court specifically stated that it would not rely on hearsay (i.e., that it was "not trying the case of the newspaper"). Furthermore, the court's findings make no mention of the hearsay allegations. In our judgment, therefore, the complaints about hearsay have no basis.

Finally, the Developers challenge the court's conclusion, in the initial remand order, that the "FACT committee incorporated the information from Commissioner Smith into its April 23, 2014 letter." According to the Developers, Commissioner Smith's arguments (as recorded in the minutes of the FACT meeting) are similar to the arguments in the FACT letter because the minutes and the letter were both authored by the same person – FACT's secretary, Mr. Proffitt. In our view, however, the Developers have posited one explanation, but not the sole explanation, for the similarity between the Commissioner's arguments and the arguments in the FACT letter. The court was not required to accept the Developers' explanation; nor was the court clearly erroneous in finding that explanation unpersuasive. *See Bricker v. Warch*, 152 Md. App. 119, 137 (2003). Because of FACT's failure to attribute its arguments to Commissioner Smith and because of the Commissioner's failure to identify the arguments as his own when they reappeared in the FACT letter, the court could reasonably infer that the letter was the

product of a covert effort to recast a partisan argument in the guise of a neutral, expert opinion.[19]

## V.     Was There an Adequate Factual Basis for the Council's Conclusions?

The Developers argue that the circuit court erred in considering the County Council's conclusions on remand, because, they say, those conclusions are unsupported by record evidence. Applying the forgiving standard of review for the adequacy of factual findings by an administrative agency (*Kenwood Gardens Condos., Inc. v. Whalen Props., LLC*, 449 Md. 313, 325 (2016)), we disagree.

The Developers attack the Council's conclusion that, during the hearings before the Board of County Commissioners in 2014, there were "[s]erious challenges" to the scope of the traffic study, including whether the study included all appropriate intersections. In support of that argument, the Developers cite their expert's testimony about the study and RALE's evidence (including expert testimony) about the subject. In light of the Developers' argument, it appears that there were challenges to the scope of the traffic study and that the only question is whether the challenges can accurately be described as "serious." The Council was not clearly erroneous because of a disagreement about its choice of an adjective.[20]

---

[19] In their challenge to the initial decision to remand the case, the Developers complain that the court conducted its own judicial fact-finding. The complaint has no merit, because § 5-862(a)(2) requires a court make a finding as to whether a violation of the ethics law has occurred.

[20] The Developers also attack the Council's conclusion that the testimony and exhibits before it "revealed additional inconsistencies and irregularities relating to the crucial question of the adequacy of the transportation network." Read in context, the

31

The Developers go on to attack the Council's finding of "extreme irregularity surrounding the FACT letter." Their argument repeats a number of assertions that we have already found inadequate to undermine the circuit court's findings concerning the unusual provenance of the FACT letter: Commissioner Smith was merely performing his duty as the liaison to FACT when he attended the meeting; the FACT letter is consistent with the organization's mission to improve traffic conditions in Frederick County; and a majority of the Commissioners said that the FACT letter did not affect their vote. We reject these arguments for the same reasons that we have previously rejected the earlier variants of them.[21]

The Developers close with an attack on the Council's decision to ask them to recommence the application process before the Planning Commission. They say that it was "illogical" to require them to return to the Planning Commission, because that Commission had approved the PUD before the FACT letter came into existence.

In our view, the Developers appear not to fully appreciate the difficult choices that the Council had to make. The Council resolved that the matter should return to the

_____

Council was not referring to a problem relating to the transportation network in addition to the one concerning the adequacy of the traffic study. The "inconsistencies and irregularities" pertaining to traffic were in addition to other "inconsistencies and irregularities" relating to the origins of the FACT letter, which the Council had just discussed. The Council attributed the "additional inconsistencies and irregularities" to the County's expert's unavailability at one point in the proceeding when the scope of the traffic study was challenged.

[21] In addition, we note that, as an administrative agency, the County Council was not categorically prohibited from relying on hearsay. *See*, *e.g*., *Travers v. Baltimore Police Dep't*, 115 Md. App. 395, 408, 411-12 (1997).

32

Planning Commission because it was unable to reconcile the assertions that the letter had no impact on the Board's approval of the PUD with the considerable amount of evidence that the letter was not only intended to have some kind of impact, but probably did. As we read the Council's resolution, it is apparent that the Council wanted to ensure an untainted process. That approach was not illogical.

## VI.    Did the Council Exceed the Scope of the Remand?

In remanding the case to the new County Council in 2015, the circuit court wrote that, based on the record before it, it could not make a judgment on the petition for judicial review, because questions about the origins of the FACT letter, the timing of the letter, and the potential for reliance on it would form an integral part of the decision. The court remanded the case "for further proceedings, including testimony, to resolve" those issues. The Developers argue that the Council exceeded the scope of the remand by commenting on the record that it had generated and by reaching new conclusions about traffic and the FACT letter.[22]

The court remanded the case pursuant to GP § 5-862(a)(2), which envisions that the governing body will reconsider its decision. The court directed the Council to address the FACT letter and its impact, but imposed no other restrictions on how the Council would be required to go about that task. In these circumstances, it is

---

[22] In support of that argument, the Developers cite *Hickory Hills Ltd. P'ship v. Sec'y of State*, 84 Md. App. 677 (1990). *Hickory Hills* holds that if a court orders an agency to take additional evidence under what is now § 10-222(f) of the State Government Article, the order is not immediately appealable. The case does not support the conclusion that the Council exceeded the scope of the remand in this case.

understandable that the Council would reach conclusions about the FACT letter. It is also understandable that the Council would comment about its conclusions, and particularly about the challenge of evaluating the impact of the FACT letter and about the appropriate way to proceed. And although the question of traffic adequacy is arguably a bit afield from the FACT letter, we are reluctant to conclude that it is beyond the scope of reconsideration, given that the FACT letter itself concerned traffic and road improvements. For these reasons, we disagree that the Council exceeded the scope of remand.[23]

## VII.    Did the Court Err in Not Considering the Broader Agency Record?

The Developers argue that, when the case returned to the circuit court after the initial remand, the court was required to consider whether the agency record supported the approval of the PUD. We disagree. When the case returned to the circuit court, the focus was still on whether an undisclosed ex parte communication had occurred and, if so, what should happen next. With the benefit of the Council's work on remand, the court reiterated and expanded upon its prior conclusion that an undisclosed ex parte

---

[23] The Developers argue, briefly, that the Council violated the doctrine of separation of powers by reevaluating the agency record while petitions for judicial review were pending. The difficulty with that argument is that, in accordance with GP § 5-862(a)(2), the court required the Council to reconsider or reevaluate the record in some respect. It is hard to see how the Council usurped the court's essential powers by complying with the court's direction. The Council did not, for example, claim the ability to do something at the core of the judicial power, such as to render a final judgment that adjudicates a party's rights. *See* Dan Friedman, *The Maryland State Constitution* 35 (2011) (citing *Shell Oil Co. v. Supervisor of Assessments*, 276 Md. 36 (1975)). In fact, the Council had to ask the court to intervene because it was powerless to require the Developers to comply with its conception of how the case should proceed.

communication had occurred. In view of that conclusion, GP § 5-862(a)(2) left the court with no choice other than to order a remand.

## VIII. Did the Council Use the Remand as a Pretext to Reverse the Prior Approval?

The Developers assert that, after the circuit court found that Commissioner Smith had engaged in an undisclosed ex parte communication and remanded the case for further proceedings, the County Council used the remand as a "pretext" to reevaluate the Board of County Commissioners' decision. They cite a number of cases that generally prohibit an administrative agency from reversing an earlier decision solely because of a "change of mind." *See*, *e.g.*, *Schultze v. Montgomery County Planning Bd.*, 230 Md. 76, 81-82 (1962) (holding that, in the absence of a statute concerning reconsideration, an agency may reconsider a prior decision only because of fraud, surprise, mistake or inadvertence, and not because of a mere change in mind); *Kay Constr. Co. v. County Council for Montgomery County*, 227 Md. 479, 489 (1962) (holding that the substitution of one councilmember of one conviction for another councilmember of another conviction did not satisfy the statutory requirement of "good cause" for reconsideration of a zoning decision); *see also Calvert County Planning Comm'n v. Howlin Realty Mgmt., Inc.*, 364 Md. 301, 325 (2001) (holding that an agency could reconsider a decision because it had been misled, but not because of a mere change of mind).

The County responds that the "change-of-mind" rule comes into play only when an agency reconsiders a decision on the basis of a ground that it is not authorized to employ. By contrast, once a court has ordered an agency to reconsider a matter, as the circuit court did in this case, the agency has no choice but to decide whether to change its

35

mind.  Because the circuit court's remand order "did not presume to determine what 'proceedings' were required" (*People's Counsel for Baltimore County v. Country Ridge Shopping Center, Inc*., 144 Md. App. 580, 593 (2002)), the agency – in this case, the newly constituted County Council – had the discretion to decide how to proceed.  *See id.*

In its discretion, the Council could decide to proceed de novo, with an entirely new hearing, as it did.  *See id.*  We see no basis to conclude that the Council abused its discretion in concluding that because it could not reconcile the conflicting information before it about the impact of the FACT letter and the adequacy of the transportation network, the reconsideration of the rezoning application required that the process begin anew before the Planning Commission.

## IX.    Does It Matter Whether There Were "Extreme Circumstances"?

In ordering the remand, the circuit court cited *Montgomery County v. Stevens*, 337 Md. 471, 481 (1995), for the proposition that a remand was necessary because "'extreme circumstances [. . . ] occurred outside the scope of the administrative record.'"  Later, in vacating the decisions approving the PUD, the DRRA, and the APFO LOU, the court briefly referred again to the "extreme" nature of Commissioner Smith's failure to disclose that the substance of the FACT letter originated with him.

Both the Developers and Commissioner Smith challenge the factual basis for a conclusion of "extreme circumstances."  We need not consider that challenge, however, because the question of "extreme circumstances" was relevant only to the court's decision to permit a deposition of Commissioner Smith, not to its subsequent decisions to

remand the case to permit the County Council to conduct further proceedings or to vacate the PUD, the DRRA, and the APFO LOU.

In *Montgomery County v. Stevens*, 337 Md. at 481, the Court of Appeals quoted *Public Service Comm'n v. Patuxent Valley Conservation League*, 300 Md. 200, 214 (1984), for the proposition that "'a party challenging agency action is ordinarily forbidden from inquiring into the mental processes of an administrative official.'" *Accord Maryland Bd. of Physicians v. Geier*, 225 Md. App. 114, 119 (2015). "Departure from this fundamental principle," the Court said, "is extremely rare." *Montgomery County v. Stevens*, 337 Md. at 481. Nonetheless, "if the party challenging the agency action could make a 'strong showing' of, as opposed to a mere allegation of, the existence of fraud or extreme circumstances which occurred outside the scope of the administrative record, a deposition of the administrative decision maker might be permissible." *Id.* In other words, the question of "extreme circumstances" pertains to whether a party may obtain discovery from a quasi-judicial decisionmaker in an action for judicial review.

In this case, the question of "extreme circumstances" was relevant to the decision to permit RALE to depose Commissioner Smith – a decision that the circuit court made on January 27, 2015, before it remanded the case to the County Council. The issue of "extreme circumstances" was not relevant to the court's other decisions. Under GP § 5-862(a)(2), the court was required to remand the case to the County Council when it found a violation of the restriction on undisclosed ex parte communications: it did not matter whether the violation was or was not "extreme."

37

In short, in the context of the opinion that remanded the proceeding to the Council and the opinion that vacated the PUD, DRRA, and APFO LOU, the references to "extreme circumstances" or the extreme nature of Commissioner Smith's conduct were surplusage – unnecessary statements that had no legal effect.

## CONCLUSION

We affirm the judgment of the circuit court. The court correctly concluded that Commissioner Smith engaged in an undisclosed ex parte communication, in violation of GP § 5-859(b), when he surreptitiously procured a piece of evidence that was used in a quasi-judicial proceeding in which he himself was one of the decisionmakers. Contrary to Commissioner Smith's arguments, the prohibition on undisclosed ex parte communications in GP § 5-859(b) does not violate a quasi-judicial decisionmaker's First Amendment rights. The circuit court's findings have support in the record, as do the findings of the Frederick County Council. In view of its findings, GP § 5-862(b) required the court to remand the case to the County Council for reconsideration. Once the County Council, on reconsideration, had elected to require the Developers to recommence the application process, the circuit court did not err in implementing the Council's decision.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANTS PAYNE INVESTMENTS LLC AND 75-80 PROPERTIES LLC.**