*75-80 Properties, L.L.C., et al. v. RALE, Inc., et al.*, No. 59, September Term, 2019, Opinion by Booth, J.

**STATUTORY INTERPRETATION – FREDERICK COUNTY ETHICS ORDINANCE APPLICABLE TO ETHICS VIOLATIONS DURING DEVELOPMENT APPROVAL PROCESS**. Under the plain language of the Frederick County Ethics Statute, Maryland Code, General Provisions Article ("GP") § 5-862, the circuit court was not required to undertake a procedural due process analysis and determine whether the violation of the ethics statute denied an aggrieved party procedural due process within the underlying zoning proceeding. Under the plain language of the statute, the circuit court is required to determine, within the context of a judicial review proceeding, whether a violation of the Ethics Statute occurred. If the circuit court makes a factual determination that a violation occurred, its work is done, and the court "shall" remand the matter to the Frederick County governing body for "reconsideration."

The Ethics Statute does not provide any parameters or limitations on Frederick County's reconsideration proceedings on remand. Accordingly, the Frederick County Council has the authority to determine the scope of the proceeding. After the circuit court determined that a violation of the Ethics Statute occurred, and after the Frederick County Council determined that it would conduct a *de novo* hearing on the Developers' application, the circuit court did not err in vacating the development approvals in connection with its remand order, given the Developers' refusal to participate in the reconsideration proceeding.

**DOCTRINE OF ZONING ESTOPPEL.** The Court of Appeals declined to recognize or apply equitable estoppel under the facts of this case. Assuming (without deciding) that the Court recognizes the doctrine, the Developers did not demonstrate the elements of good faith and substantial reliance on the development approvals where the actions alleged to have been made in reliance on the development approvals consisted of either: prospective concessions or agreements negotiated in anticipation of receiving discretionary final development approval; or actions undertaken at their own risk after receiving final development approval during the pendency of a judicial review proceeding. The Court also held that there was no ambiguity in the definition of ex parte communication that would warrant the application of principles of equitable estoppel.

Circuit Court for Frederick County
Case No.: 10-C-14-001899
Argued: May 13, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 59

September Term, 2019

75-80 PROPERTIES, L.L.C., et al.

v.

RALE, INC., et al.

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

Opinion by Booth, J.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Filed: August 24, 2020

This case requires that we examine a special provision of the Maryland Public Ethics Law, codified in the General Provisions Article ("GP") of the Maryland Code at §§ 5-857 – 5-862, that applies when the Frederick County governing body is undertaking review of a zoning or development application. Under the statute, a member of the governing body must disclose ex parte communications with any individual concerning a pending zoning or development application during the pendency of the application. If a violation of the statute occurs, the Frederick County Ethics Commission or any aggrieved party of record has standing to raise the violation within a petition for judicial review by the circuit court. If the circuit court determines that a violation has occurred, the language of the statute mandates that the circuit court remand the proceeding to the Frederick County governing body for "reconsideration."

In this case, upon consideration of petitions for judicial review filed by a local citizens group that opposed the Developers' application, the Circuit Court for Frederick County found that a former member of the Frederick County Board of Commissioners had violated the ethics statute by engaging in an ex parte communication, during the pendency of a proceeding to apply a floating zone to an approximately 400-acre property. The circuit court remanded the case to the Frederick County Council for reconsideration. The Frederick County Council decided to reconsider the Developers' rezoning and development application in a *de novo* proceeding. Upset with the Council's decision that the application be considered anew, the Developers refused to participate. Having reached an impasse, the Frederick County Council requested that the circuit court enter an appropriate order

which would allow the Council to proceed with a *de novo* reconsideration proceeding. As part of its remand, the circuit court vacated the original development approvals.

The Developers appealed to the Court of Special Appeals. In a reported opinion, the Court of Special Appeals affirmed the judgment of the circuit court. *75-80 Props., LLC v. RALE, Inc.*, 242 Md. App. 377, 416–17 (2019). For the reasons set forth in this opinion, we affirm the judgment of the Court of Special Appeals.

## I.

## Background

### A. *The Developers' Development Applications*

In November 2012, Petitioners Payne Investments, LLC and 75-80 Properties, LLC (collectively "the Developers") filed an application to rezone approximately 450 acres of land in southeastern Frederick County from its current agricultural designation[1] to allow for a planned unit development ("PUD"),[2] to be called the "Monrovia Town Center." The

---

[1] The Developers' property is zoned in the Agricultural District (A) under the Frederick County Zoning Ordinance. The Zoning Ordinance describes the purpose of the Agricultural District (A) as preserving "productive agricultural land and the character and quality of the rural environment and to prevent urbanization where roads and other public facilities are scaled to meet only rural needs." Frederick County Code, § 1-19-5.220.

[2] The PUD District is a floating zone under the Frederick County Zoning Ordinance. For a discussion of floating zones generally, *see County Council of Prince George's County v. Zimmer Development Co.*, 444 Md. 490, 514–17 (2015). Floating zones are often used to allow the development of specialized or mixed uses. *Id.* at 515 (citations omitted). As part of the approval process for a floating zone, the local zoning authority "must find generally that the legislative prerequisites for the zone are met and the rezoning is compatible with the surrounding neighborhood[.]" *Id.* (citations omitted). According to the Frederick County Zoning Ordinance, the purpose and intent of the floating zones is to "provide new development and redevelopment within identified growth areas that result in an integrated mixture of commercial, employment, residential, recreational, civil and/or

---

application sought approval for the construction of 1,510 residential units. Along with the PUD rezoning application, the Developers filed an application for a development rights and responsibilities agreement ("DRRA"), to contractually secure the zoning and development approvals for a term of years, pursuant to Maryland Code, Land Use Article ("LU") § 7-304(a). Additionally, the Developers requested an Adequate Public Facility Ordinance Letter of Understanding ("APFO LOU") which would define the public facilities (such as road improvements and sewer facilities) that would be required to be constructed to satisfy the County's Adequate Public Facilities Ordinance (the PUD, DRRA, and APFO LOU are sometimes collectively referred to as the "Development Approvals").

In November 2013, the Frederick County Planning Commission ("the Planning Commission") voted to recommend that the Board of County Commissioners approve the PUD and found that the draft DRRA was consistent with the County's Comprehensive Plan.

After holding three public hearings in January 2014, the Board of County Commissioners approved the PUD, subject to a number of conditions. The Developers accepted the conditions. In March 2014, the Planning Commission recommended approval of a revised plan.

In April 2014, the Board of County Commissioners held a total of four public hearings concerning the Development Approvals for the Monrovia Town Center. The public hearings were well-attended, and there was considerable public opposition to the proposed development. Much of the public opposition focused on traffic safety and adequacy of public

---

cultural land uses as provided within the appropriate Frederick County Comprehensive, Community, or Corridor Plan." Frederick County Code, § 1-19-10.500.1.

roads. Throughout the approval process, a local citizens opposition group, Residents Against Landsdale Expansion ("RALE"), actively participated in the public hearings.

### B. The Ex Parte Communications: Commissioner Smith, the FACT Meeting, and FACT Letter

On April 14, 2014, before the Board's final public meeting, Commissioner C. Paul Smith attended a public meeting of the Frederick Area Committee for Transportation ("FACT"). FACT is composed of representatives of the business community and the local government who have training or expertise in transportation issues. FACT's mission is to analyze the efficacy of and promote the development of transportation improvements in the County. Commissioner Smith was the Board of County Commissioners' representative on the FACT advisory board. FACT's advisory board also included Michael Smariga, a retired principal in the engineering firm engaged by the Developers to process the rezoning application. Michael Smariga's son, Christopher Smariga, was the lead engineer in creating and processing the application.

At the FACT meeting on April 14, 2014, Commissioner Smith spoke in favor of the proposed development, and argued that the improvements the Developers proposed to make to the nearby highways (MD Routes 75 and 80) would substantially upgrade the regional transportation network and benefit all the residents in that area of the County. The arguments that Commissioner Smith articulated in favor of the Developers' application ultimately were included in a letter purportedly from FACT to the Board of County Commissioners in support of the Developers' application. The FACT letter was sent to the Board of County Commissioners via electronic mail at 2:41 p.m. on April 23, 2014—a

4

little more than three hours prior to the beginning of the final public hearing on the Developers' application. Although Commissioner Smith's arguments were included in the letter, the arguments were not attributed to Commissioner Smith.

## C. Final Board of County Commissioners' Hearing on the Developers' Application

At the public hearing on April 23, the Board of County Commissioners considered public comment from numerous witnesses, including the county staff, the Developers, RALE representatives, and the public. Like the other public hearings concerning the Developers' application, testimony from the public again focused overwhelmingly on traffic safety and road adequacy concerns. One of the witnesses was RALE's traffic consulting engineer, who testified that the Developers' traffic study was flawed.

At the conclusion of all of the evidence, the Board of County Commissioners President, Blaine Young, introduced and read the entire FACT letter into the record, stating that the development of the Monrovia Town Center would provide "significant funding for improvements" in the Monrovia area, and that this "public-private partnership is the only likely scenario for any significant improvement at this point." After reading the FACT letter into the record and naming its signatory (FACT's secretary, Michael Proffitt), President Young then read the names of each of the FACT directors (though not the names of the advisory board members, which included Commissioner Smith). When Commissioner David Gray asked whether each of FACT's directors had signed the letter, President Young responded that they had not, but that they had given their authority for the letter to be signed.

Counsel for RALE asked for an opportunity to cross-examine a representative of FACT on the letter. President Young responded that FACT was submitting a letter, not

testifying, and accepted the letter into evidence over RALE's objection. President Young then called upon the Developers to rebut RALE's case. Counsel for the Developers emphasized the importance of the FACT letter and its contents, stating that "FACT might be the most apolitical organization in Frederick County," that "FACT doesn't care where or when land gets developed," and that "FACT cares strictly and solely about funding for transportation."

At the end of the meeting, the Board voted to approve the PUD, the DRRA, and the APFO LOU by a vote of 4-1. The Commissioners signed the operative documents on May 29, 2014.

Even though the effect of the proposed Monrovia Town Center on regional transportation facilities, and in particular MD Route 75, was a hotly contested issue, Commissioner Smith did not disclose prior to the Board of County Commissioners' vote on April 23, 2014 that he attended the FACT meeting on April 14 and that he provided detailed arguments to FACT in support of the Developers' application, which were then included in the FACT letter.

On June 3, 2014, a few days after the PUD, the DRRA, and the APFO LOU took effect, a local newspaper reported that most of the FACT members, including its president, had not seen the letter before it was sent, nor had the members voted on the correspondence or discussed its contents as a group. The newspaper reported that two FACT directors, Michael Proffitt and Michael Smariga, collaborated to draft the letter at Commissioner Smith's request, and that Commissioner Smith had stayed after the FACT meeting to discuss his arguments with Mr. Smariga. Around the same time as the publication of the

6

newspaper article, FACT submitted a second letter, characterizing its first letter's contents as "public comment" and stating that it was "not to be considered evidence."

## II.

### Proceedings Below

#### A. *Petition for Judicial Review*

RALE and certain neighboring landowners filed timely petitions in the Circuit Court for Frederick County, seeking judicial review of the approval of the PUD rezoning, the DRRA, and the APFO LOU. The circuit court scheduled a hearing on the petitions for January 26, 2015. Prior to the hearing, RALE learned of Commissioner Smith's discussions with FACT representatives about the Developers' application. On January 15, 2015, RALE issued trial subpoenas for Commissioner Smith, FACT's secretary, Michael Proffitt, and Ronald Burns (FACT member and County traffic engineer) to appear at the hearing. The County and the Developers filed motions to quash the subpoenas.

During the January 26, 2015 hearing, the circuit court heard arguments on the motions to quash the subpoenas. RALE argued that, under *Public Service Commission v. Patuxent Valley Conservation League*, 300 Md. 200, 214 (1984), it may take testimony about an administrative decisionmaker's mental process if it can make a strong showing of fraud or extreme circumstances that occurred outside the scope of the administrative record. RALE also argued, among other things, that Commissioner Smith had "orchestrated" the creation of the FACT letter, i.e., that he had participated in the creation of evidence in an administrative proceeding in which he was one of the quasi-judicial decisionmakers.

7

The circuit court issued an order dated January 27, 2015, quashing the subpoenas issued to the two FACT representatives. The court denied the motion to quash the subpoena issued to Commissioner Smith and ruled that Commissioner Smith could be examined regarding fraud, arbitrariness, capriciousness, and exceptional circumstances in connection with the FACT letter.

The County, the Developers, and former Commissioner Smith all filed motions to reconsider the January 27 order. In addition, on February 23, 2015, RALE filed a motion to remand the Developers' PUD rezoning application to the newly constituted County Council.[3] In support of its motion to remand, RALE relied upon the Frederick County Ethics Statute, GP §§ 5-857 – 5-862. Specifically, RALE argued that Commissioner Smith had engaged in undisclosed ex parte communications concerning the Developers' application, in violation of GP § 5-859(b). Consequently, RALE argued that the circuit court was required to "remand the case to the governing body for reconsideration" in accordance with the requirements set forth in GP § 5-862(a)(2).

*1. Circuit Court's March 10, 2015 Remand Order*

On March 10, 2015, the circuit court held a hearing on the pending motions and issued an opinion and order remanding the PUD application, and related approvals, to the County Council. The court based its order on the following findings of fact:

(1) That Commissioner Smith attended the April 14, 2014 FACT Committee meeting;

---

[3] On December 1, 2014, Frederick County became a charter county, with a County Executive and a County Council, rather than a Board of County Commissioners.

8

(2) That Commissioner Smith commented on [the Developers'] pending zoning application, as reflected in the April 14, 2014 FACT Committee Meeting Minutes;

(3) That [GP § 5-859(b)] states: "A member of the governing body who communicates ex parte with an individual concerning a pending application during the pendency of the application shall file with the Chief Administrative Officer a separate disclosure for each communication within the later of 7 days after the communication was made or received," and therefore requires disclosure of such communications;

(4) That pursuant to the Public Ethics 2014 Annual Report to the Frederick County Ethics Commission, wherein the [Board of County Commissioners] discloses ex parte communications, Commissioner Smith's comments were not disclosed;

(5) That the FACT Committee incorporated the information from Commissioner Smith into its April 23, 2014 letter to the [Board of County Commissioners];

(6) That the FACT letter was presented to the Commissioners with the intent to influence the pending vote;

(7) That the FACT letter was read into the record at the end of testimony by [the Board of County Commissioners] President, Blaine Young, which is highly suggestive that the [Board] relied upon it.

The court further stated that it could not make a judgment about whether the record supported the decision to approve the PUD because the FACT letter, its timing, and the potential that the Board members had relied on it "form[ed] an integral part of the record." Additionally, the circuit court "found the facts and circumstances to be extreme and [] therefore Petitioners have met their burden of making a strong showing as to an extreme circumstance." Based on these findings, the court ordered a remand "to the County for further proceedings, including testimony, to resolve the issues raised in [its] Opinion." At the same time, the circuit court quashed the subpoena served on Commissioner Smith,

9

presumably because of the remand for further proceedings, including testimony. The court did not dismiss the case.

   ## 2. *Remand Proceedings Before the Frederick County Council*

In conformance with the circuit court's opinion and order, the County Council held public hearings on June 9 and 16, and September 1, 2015. The County Council requested affidavits from former Commissioners Smith, Young, and Gray regarding "their position on the significance of the FACT correspondence on the case." Commissioner Gray, the sole vote against the application, stated that the letter had no effect on his vote and that "[i]ts source was suspect and its validity in question." Commissioner Young, who had voted in favor of the application, stated that he would have voted to approve even if the FACT letter had not been introduced. Similarly, two councilmembers who had been County Commissioners in 2014 told their new colleagues that the FACT letter did not affect their decision.

Commissioner Smith declined to submit an affidavit. Citing the threat of criminal prosecution,[4] Commissioner Smith submitted a five-page letter in which he did not deny that the discussion with FACT representatives had occurred or that he had participated in drafting the FACT letter. Instead, he argued, among other things, that the prohibition on undisclosed ex parte communications by a quasi-judicial decisionmaker would violate his First Amendment right to freedom of speech.

---

[4] Under GP § 5-862(b)(1), a knowing and willful violation of the restriction on ex parte communications is a misdemeanor.

In connection with the hearing, the Council received lengthy written submissions from RALE and from attorneys for the Developers. Additionally, the Council heard from members of the public, some of whom repeated what they had read in the newspaper that former Commissioner Smith had asked one or more of the FACT board members to submit a letter on FACT's behalf and that the directors of FACT had not authorized the letter. Perhaps because of the limitations on the Council's subpoena power,[5] it did not compel testimony from former Commissioner Smith, Mr. Smariga, Mr. Proffitt, FACT's president, or other persons who may have had personal knowledge concerning the FACT letter. No one testified concerning how Commissioner Smith's arguments made at the April 14 FACT meeting ended up in the FACT letter as FACT's opinion or provided an explanation as to why FACT appeared to distance itself from the first letter after the PUD was approved by sending a second letter in which FACT attempted to qualify its first letter as "public comment" and not as "evidence."

At the conclusion of the September 1 hearing, the County Council approved a motion, which found that as a result of the undisclosed ex parte communications, reconsideration by the County Council should be *de novo*, starting with a new hearing

---

[5] Section 211 of the Frederick County Charter states that, in investigating "the affairs of the County and the conduct and performance of any Agency," the Council may issue a subpoena to "any current County employee, County agency or department, or contractor doing business with the County upon the affirmative vote of at least six council members." Assuming a remand would be considered an investigation "of the affairs of the County," the Council still could not issue a subpoena without the approval of a supermajority of its members. Even then, it appears that the Council's subpoena powers only extended to current employees, agencies, departments, or contractors doing business with the County.

before the Planning Commission on the Developers' PUD rezoning application. The motion approved by the Council was as follows:

> Council Member Keegan-Ayer moved to send the entire matter back to the Frederick County Planning Commission (FcPc) to begin again, because at this time it is not possible to reconcile the affidavits and statements made and submitted to the Council with respect to this letter and its alleged influence on the previous Board of County Commissioners['] decision with the actions, statements, and behavior surrounding the letter; its inception; its creation; its phraseology; its timing and its introduction and handling once it was introduced[.]

The motion also contemplated that the Planning Commission would report back in six months or less, and that if possible, the Developers' fees would be waived. The motion passed by a vote of 4-3.

Following the Council's directive, Frederick County proceeded to send the matter to the Frederick County Planning Commission. However, the Developers informed the County that they would not return to the Planning Commission, contending that they had vested rights in the prior approvals. Without the applicant present for consideration of the application, the Planning Commission and the Council were unable to proceed.

The County Council subsequently adopted formal findings of fact in connection with the remand proceeding in Resolution 17-04, titled "County Council Post Remand Conclusions," effective on February 7, 2017 ("Remand Conclusions"). Based upon the testimony and other evidence presented at the remand hearings, the Council concurred with the circuit court's findings of fact that Commissioner Smith had engaged in undisclosed ex parte communications by consulting with FACT about the Developers' PUD rezoning

12

application and providing input culminating in the creation of the FACT letter. The Council found:

> Other than the statements submitted by the former County Commissioners, the testimony and exhibits presented to the County Council during the hearings were consistent with [the circuit court's] findings regarding former Commissioner Smith's ex parte activities: attending the April 14, 2014, Frederick Area Committee for Transportation (FACT) Committee meeting; commenting during that meeting about the [Monrovia Town Center] pending applications; [and] failing to disclose those ex parte communications as required by law; which led to the preparation of the FACT letter dated April 23, 2014, and its presentation to the Board of County Commissioners (BOCC) near the conclusion of its hearing with the intent to influence the upcoming vote; [and] the reading into the record of the letter by the then Board President at the end of the testimony.

In the Remand Conclusions, the Council determined that "[t]he aggregate of the information reveals extreme irregularity surrounding the FACT letter, including the timing of its presentation, handling by the [Board] President during the hearing, and the emphasis placed on this 'last minute' document during the applicant's rebuttal were extremely irregular." The Council commented on what it viewed as inconsistencies between comments by the Board President at the hearing, and the information that it later discovered. Specifically, the Council pointed out that the Board President represented that the entire FACT board had approved the letter, when in fact, testimony and documentation later revealed that only two FACT members generated the letter. Additionally, one of the FACT members generating the letter was a retired principal of the engineering firm representing the Developers and the father of an individual who had been a lead engineer for the Developers before and during the approval process. The Council also observed that

13

Commissioner Smith "did not testify during the Council hearings nor did he submit sworn testimony," as he had been requested to do.

Because the Developers declined to return to the Planning Commission and said they would oppose any effort to reconsider the PUD, DRRA, and the APFO LOU, the Council recognized that they were at an impasse, concluding that it had "done what it can to fully comply with the Remand Order." In its Remand Conclusions, the County Council requested "that the Court take such action as it deems necessary and appropriate so that the County Council may rehear the [Monrovia Town Center] application."

### 3. *Circuit Court's September 29, 2017 Opinion and Order*

After hearing legal arguments, the circuit court issued an opinion and order on September 29, 2017, in which it vacated the approval of the PUD, DRRA, and APFO LOU (the latter two documents being dependent upon the Developers successfully obtaining PUD zoning approval).[6] In its opinion, the circuit court found, again, that Commissioner Smith had engaged in an undisclosed ex parte communication, in violation of GP § 5-859(b). The court also found that "because of its timing," the ex parte communication was "deceitful to the Government as well as the public." The court stated under these circumstances, Commissioner Smith's "breach of ethics" could "not be overlooked."

---

[6] The DRRA gave the Developer contractual rights to develop the property consistent with the PUD zoning at a maximum density of 1,250 residential dwelling units for a term of 18 years. Without PUD zoning approval, the property cannot be developed at the same scale and density under the current agricultural zoning designation. Accordingly, the DRRA and APFO LOU are contingent upon the Developer receiving PUD approval.

14

The court also determined that the FACT letter, which was generated as a result of Commissioner Smith's ex parte communications, was a "substantial factor" in the Board of Commissioners' approval of the Developers' PUD rezoning application:

> In analyzing the FACT letter's significance, it is necessary to discuss the mission of FACT as well as the contents and timing of the letter. FACT is devoted to advocating for major transportation issues in Frederick County. FACT's opinion is relied upon by various governing bodies in Frederick County, including the Board of Commissioners as a neutral, unbiased entity. Commissioner Smith inserted his opinion into FACT's decision[-]making process and subsequently failed to disclose his involvement. FACT's use of Commissioner Smith's opinion without attribution tainted its assessment. Furthermore, transportation concerns remained a major issue during various meetings pending approval of the [PUD]. The FACT letter, as read into the Board of Commissioners' hearing record, addresses the potential traffic issues. The letter also argues [for] the "large benefits from the approval of the [PUD]." By citing only positive outcomes of approval of the project, the FACT letter was introduced to sway the Commissioners' votes toward approval of the project and to dissuade the community's fears of the pending project."

The court also concluded that the timing of the letter "increase[d] its propensity to influence a Commissioner's vote." The court stated that "the lack of attribution in the FACT letter was intended to deceive not only members of the Board, but the public at large."

Because the court concluded that it was unable to determine whether the Commissioners acted properly in approving the PUD, the court relied upon *People's Counsel for Baltimore County v. Country Ridge Shopping Center*, 144 Md. App. 580, 593 (2002), for the proposition that it "should remand to the agency for further proceedings."

15

The court rejected the Developers' argument that they had vested rights in the DRRA which prevented a remand, reasoning that the governing body's violation of the ethics provisions set forth in GP § 5-859 "prevents the enforcement of the DRRA."

In a separate order, the circuit court remanded the case to the County Council and vacated the PUD, the DRRA, and the APFO LOU. The Developers and Commissioner Smith appealed.[7]

## B.    *The Court of Special Appeals*

In a reported opinion, the Court of Special Appeals affirmed the judgment of the circuit court. *75-80 Props., LLC, v. RALE, Inc.*, 242 Md. App. 377, 416–17 (2019). The Developers and Commissioner Smith argued that Commissioner Smith's communications were not ex parte communications under GP § 5-859. *Id.* at 397. The Court of Special

---

[7] In its opinion, the Court of Special Appeals stated that "[i]t is unclear how Commissioner Smith has a right to be heard in this appeal." *75-80 Props., LLC v. RALE, Inc.*, 242 Md. App. 377, 396 n.9 (2019). The intermediate appellate court pointed out that Commissioner Smith was never a party to the circuit court proceeding, and that he did not file a notice of appeal until 34 days after the entry of final judgment. *Id.* Under these circumstances, the Court of Special Appeals considered Commissioner Smith's arguments "as if they were those of an amicus." *Id.* The Court of Special Appeals rejected Commissioner Smith's argument that the statute violates his First Amendment rights. The court explained that Commissioner Smith was a quasi-judicial decisionmaker and restrictions on ex parte communications with judges and quasi-judicial decisionmakers are common. *Id.* at 403–05. The Court of Special Appeals also explained that the statute does not "prohibit the Commissioner from speaking about anything; it merely required him to disclose ex parte communications concerning certain land-use disputes that were pending before him as a quasi-judicial decisionmaker." *Id.* at 404. The intermediate appellate court also rejected Commissioner Smith's argument that the Ethics Statute was unconstitutionally vague, stating that "[i]n our judgment, persons of ordinary intelligence could discern that [GP] § 5-859(b) required them to disclose that they had engaged in such communications." *Id.* at 406. Commissioner Smith filed a petition for writ of *certiorari*, which this Court denied.

Appeals rejected this argument, concluding that by its plain terms, the statute requires the disclosure of ex parte communications "with an *individual* concerning a pending application." *Id.* at 400 (emphasis in original). The intermediate appellate court reasoned that if the General Assembly "intended to confine the statute's scope to communications with an 'applicant' or a 'party'" (the interpretation taken by the Developers and Commissioner Smith), "it could have done so . . . ." *Id.* Accordingly, the Court of Special Appeals held that the circuit court correctly found that the Ethics Statute applied to Commissioner Smith's communications with FACT. *Id.* at 403.

Additionally, the Developers argued that the record did not support the circuit court's findings and subsequent vacatur. *Id.* at 408. The intermediate appellate court disagreed, finding that there was adequate factual basis for the circuit court to conclude "that Commissioner Smith had procured evidence in a proceeding that was pending before him as a quasi-judicial decisionmaker." *Id.* at 407. Because there was support in the record for this finding, it was not unreasonable for the court to find a violation of the ethics law. *Id.* The Court of Special Appeals held that under the plain and mandatory terms of GP § 5-862(a)(2), the circuit court was required to remand the case after concluding that the ethics law was violated. *Id.* at 409. Accordingly, the court affirmed the judgment of the circuit court. *Id.* at 416–17.

The Developers petitioned for a writ of *certiorari*, which we granted to consider the following questions, which we have rephrased:[8]

---

[8] The questions presented in the writ of *certiorari* were:

17

1. When a circuit court considers whether a member of the Frederick County governing body violated the Frederick County Ethics Statute during the pendency of a zoning approval, does the Ethics Statute, GP § 5-862, require that the court determine that the petitioner suffered a procedural due process violation prior to remanding the matter to the Frederick County governing body for reconsideration?

2. Did the circuit court err in entering an order vacating the development approvals obtained by the Developers after making a factual determination that a member of the Frederick County governing body violated the Ethics Statute, and after the County Council determined on remand that it would conduct a *de novo* review of the development application, but the Developers refused to participate in the reconsideration proceeding?

3. Whether zoning estoppel should be applied under the facts of this case?

For the reasons set forth below, we answer each of these questions in the negative and affirm the judgment of the Court of Special Appeals.

1. On a petition for judicial review of land use approvals, must the reviewing court evaluate an ex parte violation through the narrow lens of "procedural error," as expressly prescribed by Md. Code (2014) §§ 5-859 and 5-862 of the General Provisions ("GP") Article?
2. On a petition for judicial review, may a court vacate county approvals, including an executed [DRRA], based solely on the County's violation of GP §5-862, when the statute expressly provides that the only remedy in the land use context is remand?
3. Does zoning estoppel apply where developers, acting in good faith, substantially relied on, and partially performed under, fully-vetted county approvals and an executed DRRA, and the misconduct stems solely from the government's actions?

### III.

### Discussion

In this case, we are being asked to determine whether the circuit court correctly interpreted and applied the Ethics Statute. This Court reviews issues of statutory interpretation *de novo*. *Bd. of Cty. Comm'rs of Washington Cty. v. Perennial Solar, LLC*, 464 Md. 610, 617 (2019) (quoting *Koste v. Town of Oxford*, 431 Md. 14, 25 (2013) ("When an issue involves an interpretation and application of Maryland constitutional, statutory, or case law, an appellate court must determine whether the trial court's conclusions are legally correct under a *de novo* standard of review.")) (internal citations omitted). To the extent that the circuit court made findings of fact in connection with the application of the Ethics Statute, we review those findings under a clearly erroneous standard. *See* Md. Rule 8-131(c). "If there is any competent material evidence to support the factual findings of the [circuit] court, those findings cannot be held to be clearly erroneous." *YIVO Inst. for Jewish Research v. Zaleski*, 386 Md. 654, 663 (2005) (citations omitted). In determining whether the findings are supported by substantial evidence, we view the evidence in the light most favorable to the prevailing party. *Gen. Motors Corp. v. Schmitz*, 362 Md. 229, 233–34 (2001) (citations omitted).

The Developers argue that the circuit court incorrectly interpreted and misapplied the Ethics Statute, GP § 5-862. They contend that the statute requires that the circuit court undertake a procedural due process analysis when considering an ethics violation arising under the statute. Specifically, the Developers posit that the circuit court was required to determine whether RALE had notice and an opportunity to cross-examine or rebut the

19

FACT letter. The Developers argue that under the facts of this case, RALE suffered no procedural due process violation and therefore, the circuit court erred in remanding the matter to the Frederick County Council for reconsideration. The Developers also assert that the circuit court exceeded its authority to vacate the Development Approvals. The Developers contend that under the language of GP § 5-862, the circuit court's only remedy upon finding a violation of the Ethics Statute was to remand the matter to the Frederick County Council. Finally, the Developers argue that the Court should recognize and apply the doctrine of zoning estoppel under the facts of this case.

In response, RALE and Frederick County ("Respondents") contend that the Developers misconstrue the plain language of GP § 5-862, which is devoid of any requirement that the circuit court undertake a procedural due process analysis. Respondents argue that under the plain language of the statute, the court is simply required to determine whether an ethics violation occurred. If the court makes that factual determination, Respondents assert that under the plain language of the statute, the court is required to remand the matter back to the Frederick County governing body for reconsideration. Respondents argue that the circuit court did not err in vacating the approvals in the context of its order remanding the case to Frederick County, given the Developers' refusal to participate in the reconsideration proceeding established by the Frederick County Council. With respect to zoning estoppel, Respondents assert that, assuming that this Court recognizes the doctrine, its application is not warranted under the facts of this case.

***A. The Developers' Contentions Concerning the Interpretation and Application of the Frederick County Ethics Statute***

*1. Principles of Statutory Construction*

Despite the somewhat unusual and complex procedure recited above, the legal issues presented in this case require that the Court undertake a straightforward analysis of the language of a statute. In matters involving statutory construction, the canons applied by this Court are well-settled and have been oft repeated. The predominant goal of statutory construction is to "ascertain and effectuate the intention of the legislature." *Md.-Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 182 (2006) (citations and quotations omitted). As we have explained, "to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning." *Id.* (citations and quotations omitted); *see also Chow v. State*, 393 Md. 431, 443 (2006) (stating that "[s]tatutory construction begins with the plain language of the statute, and the ordinary, popular understanding of the English language dictates the interpretation of its terminology") (citations omitted). "We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant." *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 294 (2017) ("*Blentlinger*") (citations omitted). "When the statutory language is clear, we need not look beyond the statutory language to determine the Legislature's intent." *Walzer v. Osborne*, 395 Md. 563, 572 (2006) (citations and quotations omitted). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Blentlinger*, 456 Md. at 294

(citations omitted). Additionally, we "neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected in the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Walzer*, 395 Md. at 572 (citations and quotations omitted). "If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends." *Blentlinger*, 456 Md. at 294 (citation omitted); *Walzer*, 395 Md. at 572 (citations and quotations omitted).

If the language of the statute is ambiguous, "then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and the purpose of the enactment under consideration." *Anderson*, 395 Md. at 182 (citations and quotations omitted). "[A]mbiguity exists within a statute when there are two or more reasonable alternative interpretations of the statute." *Melton v. State*, 379 Md. 471, 477 (2004) (citations and quotations omitted). "When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all of the resources and tools of statutory construction at our disposal." *Blentlinger*, 456 Md. at 295 (citations omitted).

In construing a statute, "we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Bellard v. State*, 452 Md. 467, 482 (2017) (citations omitted). Additionally, the "meaning of the plainest language is controlled by the context in which it appears." *Md. Dep't of the Env't v. Cty. Comm'rs of Carroll Cty.*, 465 Md. 169, 203 (2019) (citations and quotations omitted). As this Court has stated,

22

> [b]ecause it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.

*Id.* (citations omitted). We apply these principles of statutory construction to the Ethics Statute.

### 2. *The Frederick County Ethics Statute – General Legislative Framework*

The Frederick County Ethics Statute is codified at GP § 5-857, *et seq.* It was adopted by the General Assembly in 2007. 2007 Md. Laws, Chap. 474.[9] The purpose of the legislation was to establish "certain ethics requirements that relate to planning and zoning proceedings and apply to members" of the County's governing body, then the Frederick County Board of Commissioners. *Id.*

The Frederick County Ethics Statute generally describes three types of prohibited conduct: (1) certain campaign contributions by persons pursuing zoning applications before the Frederick County Board of County Commissioners (*see* GP § 5-858(a)); (2) a member of the governing body participating in zoning proceedings if the member

---

[9] As originally enacted in 2007, the statute was codified at Md. Code (1984, 2009 Repl. Vol.), § 15-855(b) of the State Government Article, which provided that "[a] Board member who communicates ex parte with an individual concerning a pending application during the pendency of the application shall file with the County Manager a separate disclosure for each communication within the later of 7 days after the communication was made or received." As of December 1, 2014, the prohibition on certain undisclosed ex parte communications, and other related measures pertaining to Frederick County, were transferred without substantive change to the General Provisions Article. 2014 Md. Laws, Chap. 645. Because the Frederick County Council has now replaced the Board of County Commissioners, GP § 5-859(b) currently requires "[a] member of the governing body" to disclose certain ex parte communications.

received a campaign contribution from the applicant during the pendency of the application (*see* GP § 5-858(b)); and (3) undisclosed ex parte communications between a County Commissioner and any individual about a pending zoning application (*see* GP § 5-859(b)).

This case involves the third category of prohibited conduct—undisclosed ex parte communications. GP § 5-859(b) provides: "A member of the governing body who communicates ex parte with an individual concerning a pending application during the pendency of the application shall file with the Chief Administrative Officer a separate disclosure for each communication within the later of 7 days after the communication was made or received." As the Court of Special Appeals correctly observed, under the plain language of GP § 5-859, a member of the governing body is prohibited from engaging in an ex parte communication with "an individual" regarding a pending rezoning application, not merely an applicant or a party to the proceeding. *RALE*, 242 Md. App. at 400.

The language at the center of this dispute is set forth in GP § 5-862(a), which provides a right to judicial review where a violation is alleged to have occurred during the pendency of a zoning approval process. Under that subsection,

> (1) The Frederick County Ethics Commission or another aggrieved party of record may assert as procedural error a violation of this part in an action for judicial review of the application.
>
> (2) If the court finds that a violation of this part occurred, the court shall remand the case to the governing body for reconsideration.

24

This section gives both the Frederick County Ethics Commission and aggrieved parties standing to raise a violation of the Frederick County Ethics in an action for judicial review of the zoning proceeding, even if the violations are unrelated to the substantive issues and the evidence presented in the underlying zoning proceeding.

Where a violation of the Frederick County Ethics Statute is asserted in an action for judicial review, GP § 5-862(a)(2) requires that the court consider and make a factual determination whether a violation has occurred. If the circuit court finds that a violation occurred, the mandatory language in the statute states that the court "*shall* remand the case to the governing body for *reconsideration*." GP § 5-862(a)(2) (emphasis added).

3. *Under the Plain Language of GP § 5-862, the Circuit Court's Fact-Finding Does Not Include a Procedural Due Process Analysis*

The Developers argue that the circuit court erred in remanding this case to the County Council for reconsideration. The Developers contend that under GP § 5-862(a)(1), the term "procedural error" is synonymous with "procedural due process." The Developers assert that the circuit court was required to make a factual determination as to whether the ex parte communication that culminated in the creation and the introduction of the FACT letter, denied RALE procedural due process—i.e., notice and an opportunity to be heard. The Developers posit that the circuit court was only permitted to remand the matter to the County Council for reconsideration if the circuit court determined that RALE, as the aggrieved party, was denied notice and the opportunity to rebut the evidence presented in the FACT letter and was prejudiced.

25

We find the Developers' argument to be unavailing, and inconsistent with the plain language of the statute. "Procedural error" as used in the context of the Ethics Statute is different from "procedural due process." The Ethics Statute contains no language that would require a circuit court to make a factual determination concerning whether a violation of the Ethics Statute denied a party to the underlying proceeding procedural due process. Rather, "procedural error" describes the asserted violation which gives the aggrieved party of record or the Ethics Commission standing and a forum in which to assert a violation of the Ethics Statute. In the absence of statutory language authorizing the Ethics Commission or an aggrieved party to assert a violation of the Ethics Statute as "procedural error," they would have no standing to raise the violation in the judicial review proceeding because ordinarily, the circuit court's review is limited to whether the administrative agency, on the basis of the record before the agency, made an error of law, or whether the decision is based upon substantial evidence. *See, e.g.*, *Cty. Council of Prince George's Cty. v. Zimmer Dev. Co.*, 444 Md. 490, 573–74 (2015) (citations omitted).

The Developers' argument is not only inconsistent with the plain language of the statute, it ignores the structure of GP § 5-862(a). Subsection one describes persons who have standing to participate in a judicial review proceeding where a "procedural error" involving the Frederick County Ethics Commission is alleged to have occurred. GP § 5-862(a)(1). Once the alleged ethics violation is asserted as part of a petition for judicial review, subsection two sets forth the circuit court's scope of review—the court is simply required to determine whether "a violation of [the statute] has occurred . . . ." GP § 5-862(a)(2). If the circuit court determines that a violation has occurred, its work is

26

concluded—the statute mandates that the court "shall remand the case to the governing body for reconsideration." *Id.* Nothing in the statute requires that a circuit court make a factual determination that the person or entity asserting a violation of the Ethics Statute has been denied procedural due process. The Developers' interpretation would require us to rewrite the statute by adding additional terms, which of course, is the role of the Legislature, not the Court.

The Developers' interpretation is also illogical. GP § 5-862(a)(1) confers standing to assert an ethics violation as a "procedural error" not only on aggrieved parties of record, but also upon the Frederick County Ethics Commission. The Ethics Commission would not be a party to the underlying zoning or development proceeding and accordingly, would not have procedural due process rights for the circuit court to consider as part of its judicial review.

Furthermore, a violation of the Ethics Statute does not necessarily result in evidence or testimony that would be part of the underlying zoning hearing. Although in this instance, the undisclosed ex parte communication resulted in the culmination of a letter that was submitted into the record of the proceeding, a violation of the Ethics Statute is not limited to evidentiary matters that may give rise to procedural due process concerns. For example, a "procedural error" under the Ethics Statute could include a violation of the campaign contributions provisions. *See* GP § 5-858(a)–(b). A campaign finance violation would be unrelated to the presentation of evidence submitted in a zoning or development proceeding before the local governing body. To interpret "procedural error" as being synonymous

with a denial of the procedural due process rights of an interested party or aggrieved person to the underlying proceeding leads to an illogical reading of the statute.

The Developers' reliance upon cases involving an analysis of procedural due process rights in the context of administrative agency proceedings have no application here, as those cases do not involve the application of a statute that outlines the specific remedy when a court finds that a violation of the Ethics Statute has occurred. *See, e.g.*, *Md. State Police v. Zeigler*, 330 Md. 540, 557 (1993); *Town of Somerset v. Montgomery Cty. Bd. of Appeals*, 245 Md. 52, 66–67 (1966). The Frederick County Ethics Statute addresses the scope of circuit court review and the remedies mandated by the statute where a violation is found to have occurred. Any procedural due process arguments raised by the Developers— such as whether RALE had notice and an opportunity to cross-examine an individual concerning the FACT letter or rebut the FACT letter, whether RALE was prejudiced by the introduction of the FACT letter, or whether the letter was cumulative of other evidence in the record—are not part of the circuit court's factual determination under the plain language of GP § 5-862. The statute simply requires the circuit court to make a factual determination of whether a violation of the Ethics Statute occurred.[10]

---

[10] Instead of applying a plain language analysis of GP § 5-862, the Developers argue that we should look to case law from other jurisdictions to create a holding concerning the treatment of ex parte letters in the context of a quasi-judicial proceeding. The Developers urge us to look to *Mauna Kea Power Co. v. Board of Land and Natural Resources*, 874 P.2d 1084, 1087–88 (Haw. 1994), *Castaneda v. Brighton Corp.*, 950 P.2d. 1262, 1267 (Idaho 1998); and *Tierney v. Duris*, 536 P.2d. 435, 443 (Or. Ct. App. 1995), for guidance. We disagree. Here, under GP § 5-862, the statute specifies the remedy where the circuit court makes a factual determination that a violation of the Ethics Statute has occurred— that remedy is a remand to the Frederick County governing body for reconsideration, plain

In short, the Developers' interpretation of the statute—permitting remand only where the circuit court determines that the ethics violation affected an aggrieved party's procedural due process rights—is inconsistent with the plain language of the Ethics Statute, as well as its scope and structure, and is illogical. We will not construe a statute in a manner to create such a result. *See Della Ratta v. Dyas*, 414 Md. 556, 567 (2010) (explaining that the Court "must always be cognizant of the fundamental principle that statutory construction is approached from a 'commonsensical' perspective. Thus, we seek to avoid constructions that are illogical, unreasonable or inconsistent with common sense.") (citations and quotations omitted).

4. *The Circuit Court Did Not Err in Vacating the Development Approvals as Part of a Remand Proceeding Where the Developers Refused to Participate in the Council's Reconsideration Proceeding*

Next, the Developers argue that the circuit court's order vacating the Development Approvals "impermissibly expands a court's role on review of a zoning decision." The Developers focus on the language in the circuit court's opinion that concludes that the FACT letter was a "substantial factor" in the Board's decision to enact the PUD. Based upon this language, the Developers contend that the circuit court created a "new test" that permits the court to disregard the substantial evidence test and the deference owed to the agency/decisionmaker in favor of the court's own judgment with respect to the impact of the ex parte communication on the proceeding. We disagree.

---

and simple. To the extent that the Developers believe that this remedy is inappropriate, any revision must be made by the General Assembly, not this Court.

This case does not involve the application of the substantial evidence test that is ordinarily applied by a court when undertaking judicial review of an administrative agency's approval of a zoning decision. Here, the Ethics Statute provides a separate and distinct statutory review process that the circuit court must undertake where an aggrieved party has asserted a violation of the Frederick County Ethics Statute. As previously noted, the statute *mandates* that the circuit court remand a development or rezoning approval to the Frederick County governing body if the court finds a violation of the Frederick County Ethics Statute.

Within the context of the petition for judicial review, RALE asserted that Commissioner Smith violated the Frederick County Ethics Statute. When that occurred, under the process outlined in GP § 5-862(a)(2), the circuit court was required to make a factual determination whether a violation occurred. Here, the court determined that Commissioner Smith made an undisclosed ex parte communication in violation of the Ethics Statute. We agree with the Court of Special Appeals that the court's findings of fact were not clearly erroneous.[11]

Once the circuit court found that a violation of the Ethics Statute occurred, under the plain language of GP § 5-862(a)(2), the circuit court was required to remand the matter

---

[11] In their appeal to the Court of Special Appeals, the Developers argued that Commissioner Smith's communications with FACT representatives did not constitute ex parte communications prohibited by GP § 5-859. The Developers do not make that argument here, other than to argue that the statute is ambiguous and therefore, we should apply principles of equitable estoppel, which is discussed in part III.B.4. herein. We agree with the Court of Special Appeals' conclusions concerning Commissioner Smith's ex parte communications and its determination that the circuit court's findings of fact on that issue were not clearly erroneous. *RALE*, 242 Md. App. at 397–403.

to the Frederick County Council for reconsideration. The term "shall" connotes that an action is mandatory, not subject to discretion or satisfaction of further conditions. *Harrison-Solomon v. State*, 442 Md. 254, 269 (2015). We agree with the Court of Special Appeals that "[t]he circuit court did what the statute required it to do." *RALE*, 242 Md. App. at 409.

On remand, the statute requires that the governing body "reconsider" the decision. "In seeking to apply the plain[ ]meaning rule, it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning." *Hoang v. Lowery*, 469 Md. 95, 120 (2020) (quoting *Ali v. CIT Tech. Fin. Servs., Inc.*, 416 Md. 249, 262 (2010)). To "reconsider" means "to consider again especially with a view to changing or reversing." *Reconsider*, Merriam-Webster (2020), https://perma.cc/C8VK-FK59; *see also Tracey v. Solsesky ex rel Solsesky*, 427 Md. 627, 667 (2012) (overruled on other grounds by Md. Code, Courts and Judicial Procedure Article ("CJ") § 3-1901) (Judge Wilner explaining that "[a] motion for reconsideration gives each judge of the Court an opportunity to take another look at the issue and to rethink the position formerly asserted.").

In *Peoples Counsel for Baltimore County v. Country Ridge Shopping Center, Inc.*, 144 Md. App. 580 (2002), the Court of Special Appeals was asked to determine the parameters of a remand to a board of appeals of a special exception where the case was reversed based upon a matter of statutory interpretation. After initially denying the special exception, on remand, the board of appeals was required to reconsider whether the applicant was entitled to a special exception. *Id.* at 586–88. By the time the case was remanded, the composition of the board of appeals had changed. *Id.* at 589. On remand,

the board did not consider additional evidence, but rather, reviewed the existing evidence in light of the Court of Special Appeals' holding as to the correct legal standard. *Id.* at 589–90. By a vote of 2-1, the board voted again to deny the special exception. *Id.* at 590.

On appeal, the applicant asserted that because the board had two new members, it was required on remand to conduct a *de novo* hearing on the special exception. *Id.* at 593. The Court of Special Appeals rejected this argument, holding that the language of its initial remand "'for further proceedings' was deliberately open-ended." *Id.* The intermediate appellate court explained that the board had discretion to determine the nature and scope of the further proceedings it would conduct to reconsider its decision denying the special exception:

> We reject the appellees' argument that "further proceedings" necessarily implies a *de novo* hearing, with witnesses being called and arguments being made as if for the first time. "Further proceedings" could, of course, embrace such a procedure but could also embrace other less radical procedures. It was not for us to anticipate what "further proceedings" might be required.

*Id.* The Court of Special Appeals explained that the board had the discretion to adopt a number of procedures for considering the special exception on remand, ranging from conducting a *de novo* hearing to clarifying its original rationale. *Id.* at 593–94.

Similarly, in the context of the Ethics Statute, where the circuit court finds that a violation has occurred, the plain language of GP § 5-862(a) expressly contemplates that the governing body shall reconsider or revisit its prior decision. Moreover, the statute does not establish any parameters or limitations on the governing body's reconsideration of the prior zoning or development approval. Given the lack of any limitation by the General

Assembly on the governing body's authority to "reconsider" its decision under the Ethics Statute, we conclude that the local legislative body has broad discretion to determine how to conduct its reconsideration proceedings, including starting the zoning review and approval process anew.

In this case, on remand, after undertaking an inquiry into the ex parte communication, including its creation and the potential effect that it had on the proceeding, the Frederick County Council determined that it would undertake a *de novo* review of the zoning application as part of its reconsideration proceeding. The Developers refused to participate in that process.

Had the Developers accepted the Frederick County Council's decision with respect to the reconsideration proceedings, the circuit court case would have concluded, and there would have been no reason for the circuit court to enter an order vacating the approval. Instead, the Developers disagreed and refused to participate in a *de novo* proceeding. As a result of this impasse, the Frederick County Council enlisted the assistance of the circuit court, through the case that was still open and pending, requesting "that the Court take such action as it deems necessary so that the County Council may rehear the [Monrovia Town Center] application." In other words, the Frederick County Council sought relief from the circuit court, within the context of the ongoing petition for judicial review, to enable it to carry out its responsibilities of "reconsideration" under GP § 5-862(a)(2). Given the Developers' refusal to consent to the Frederick County Council's decision to conduct a *de novo* hearing, which was within the Council's discretion to undertake, the circuit court did

33

not err in entering an order vacating the approvals to enable the Council to proceed with the format that they were entitled to implement under the statute.

Finally, the Developers urge us to rely upon out-of-state case law and fashion a holding that requires a factual determination of prejudice where an ex parte communication is the basis for a vacatur of a development approval. *See, e.g.*, *Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380, 387 (7th Cir. 2014); *Whitaker-Merrell Co. v. Profit Counselors, Inc.*, 748 F.2d 354, 359 (6th Cir. 1984); *In re the Petition of the City of Overland Park*, 736 P.2d 923, 928 (Kan. 1987). The Developers also argue that the vacatur of the approvals is punitive by "[i]gnoring the substantial evidence supporting the Approvals and focusing solely on the ethics violation." As previously noted, it is not the role of the Court to rewrite the plain language of the statute out of concerns of perceived fairness. Where a statute is lawfully enacted under the police powers of the state and does not violate or infringe upon a constitutional right, we do not question its wisdom or expediency or undertake a judicial revision to achieve what some may argue is a more equitable outcome.

## B. The Doctrine of Zoning Estoppel

The Developers also argue that we should recognize and apply the doctrine of zoning estoppel and hold that the circuit court was prohibited from vacating the PUD approval and related Development Approvals under that doctrine, and that similarly, the County Council was estopped from deciding to reconsider the Developers' rezoning application *de novo.* The Developers contend that we should recognize and apply the doctrine of zoning estoppel because: (1) they relied in good faith that the County would

follow its own ethics law, and approvals were passed in conformity with all applicable zoning/land use laws; (2) Developers incurred extensive obligations and expenses that it would be highly inequitable to destroy their rights based on the wrongdoing of the County; and (3) other jurisdictions apply zoning estoppel where, as here, there is good faith and substantial reliance to the Developers' detriment.

*1. An Overview of the Discussion of the Doctrine in Our Previous Cases*

Although this Court has discussed the doctrine of zoning estoppel in several cases and has perhaps shown a receptivity toward the doctrine when we last discussed the concept, *see Md. Reclamation Assocs., Inc. v. Harford Cty.*, 414 Md. 1, 52–63 (2010) ("*MRA*"), we have thus far refused to recognize or apply it in Maryland.

Over the years, we have repeatedly cited a 1971 article by David G. Heeter, which we have "found to be the most helpful in explicating the doctrine of zoning estoppel and how it differs from vested rights." *MRA*, 414 Md. at 55 (citing David G. Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes*, 1971 Urb. L. Ann. 63, 66 (1971) (hereinafter "Heeter")). The traditional, "black-letter" definition of zoning estoppel is:

> A local government exercising its zoning powers will be estopped when a property owner,
>
> (1) relying in good faith,
>
> (2) upon some act or omission of the government,
>
> (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights which he ostensibly had acquired.

Heeter, *supra*, at 66.  As we explained in *Sycamore Realty Co. v. People's Counsel of*

*Baltimore County*,

> A typical zoning estoppel scenario arises when the government issues a permit to a citizen that allows him or her to develop property in some way.  Commonly, after the citizen has incurred some expense or has changed his or her position in reliance upon the permit, the property for which the permit was granted is rezoned so that the citizen's intended use is illegal.  In such a situation, many courts allow the citizen to assert zoning estoppel as a defense to the government's attempt to enjoin the property use that violates the new zoning scheme.

344 Md. 57, 64 (1996); *see also* Walter F. Witt, Jr., *Vested Rights in Land Uses—A View*

*from the Practitioner's Perspective*, 21 Real. Prop. Prob. & Tr. J. 317, 319 (1986) ("The

doctrine of equitable estoppel provides that the right to use or develop land cannot be

infringed by legislative action when the owner or developer of such land has in good faith

relied upon some act or failure to act by a governmental body and made a substantial

change in position.").

Heeter identifies four categories of cases in which a zoning estoppel claim may

arise, consisting of a landowner or developer's reliance upon: "(1) a validly issued permit;

(2) the probability of issuance of a permit; (3) an erroneously issued permit; or (4) the non-

enforcement of a zoning violation."  Heeter, *supra*, at 67.  As Heeter explains, although

some courts blend the doctrines of zoning estoppel and vested rights together, "the origins

of the two defenses are quite different.  The defense of estoppel is derived from equity, but

the defense of vested rights reflects principles of common and constitutional law."  Heeter,

*supra*, at 64–65; *see also Sycamore*, 344 Md. at 67 (quoting Heeter's distinction between vested rights and zoning estoppel).

In *Sycamore*, we declined to adopt zoning estoppel under the facts of that case and signaled that if we were to adopt the doctrine in the future, we would only apply it where the property owner had acquired a vested right in the proposed use. 344 Md. at 66–67 ("We have never adopted zoning estoppel in Maryland. Instead, we, like all of the other courts that have declined to adopt zoning estoppel, 'recognize a legal defense cast in terms of whether the property owner acquired 'vested rights' to use his land without governmental interference.'") (quoting Heeter, *supra*, at 64).

In *MRA*, we again declined to adopt the doctrine, although we recognized that there may be instances in which the doctrine might be applied:

> We have not explicitly adopted the doctrine of zoning estoppel, but we recognize that as zoning and permitting processes become more complex, the need for such a doctrine grows. Today, land use is much more highly regulated than it was fifty years ago—environmental concerns abound, and vehicular traffic demands seem to mushroom every year. Thus, a property owner who seeks to build or develop may well incur sizable expenses for experts in engineering, various environmental fields, traffic flow, archeology, etc., before putting a spade into the ground. With increasing public appreciation for open space and environmental protection causing apprehension about new construction, the likelihood a developing landowner will face serious opposition is high. Indeed, a developer faces quite a tortured process. . . .
>
> But we also cannot ignore a local government's responsibility to its residents, and thus, Maryland courts should not apply the doctrine casually. As open space disappears, and scientific knowledge about the adverse environmental impact from people's use of land grows, local governments struggle to balance the legitimate interests and rights of land owners

37

> wishing to develop against equally legitimate environmental and community concerns. Due to the delicacy of this balancing act, and the overriding need to protect the public, local government cannot always chart a steady course through the Scylla and Charybdis of these disparate interests. Land developers must understand that, to a *limited* extent, the local government will meander, and before they incur significant expense without final permitting, they must carefully assess the risk that the government will shift course. On the other hand, there may be situations in which the developer's good faith reliance on government action in the pre-construction stage is so extensive and expensive that zoning estoppel is an appropriate doctrine to apply.

414 Md. at 56–57 (emphasis in original).

Despite our recognition that there may be circumstances in which we would apply the doctrine, we stopped "short of adopting zoning estoppel in this case as the facts set forth in this record do not support its application." *Id.* at 57. We noted that "[f]or decades Maryland has maintained a stricter stance than most states in protecting government's right to downzone in the face of planned construction." *Id.* at 57–58 (citing 9-52D Patrick J. Rohan & Eric Damian Kelly, *Zoning and Land Use Controls* § 52D.03 (2009)). We explained that "[a]lthough we may sometimes adopt a new principle of law in a case in which the facts do not fit the doctrine, the doctrine of equitable estoppel is so fact-specific that it would be imprudent to depart from this history before we are faced with a case presenting circumstances for its application." *Id.* at 58. We stated that "zoning estoppel must be applied, if at all, sparingly and with utmost caution . . . . Squaring with this cautious approach, we conclude that the burden of establishing the facts to support that theory must fall on the person or entity claiming the benefit of the doctrine." *Id.*

We noted that "[u]nder the theory of zoning estoppel, if the developer 'has good reason to believe, before or while acting to his detriment, that the official's mind may soon change, estoppel may not be justified.'" *Id.* (emphasis in original omitted) (quoting Robert M. Rhodes, et al, *Vested Rights: Establishing Predictability in a Changing Regulatory System*, 13 Stetson L. Rev. 1, 4 (1983)). "At the heart of establishing 'good faith' is proof that the claimant lacked knowledge of those facts that would have put it on sufficient notice that it should not rely on the government action in question." *Id.* (citing Heeter, *supra* at 77–82).

In *MRA*, we declined to recognize or apply the doctrine under the facts of the case. *Id.* at 63. We determined that the developer failed to satisfy the good faith element because there were sufficient facts available to them prior to the purchase of their land for a rubble landfill that "should have alerted them to the real possibility that its plans for a rubble landfill would not come to fruition" including strong public opposition. *Id.* at 59. We explained that "[g]enerally, purchase of land, by itself, is insufficient to constitute substantial reliance." *Id.* at 60–61 (internal citations omitted). Nor did we find that the developer's engineering costs and expenses incurred in connection with the development approval process were sufficient to meet the developer's burden to prove the fact and the extent of their reliance on the county council's action. *Id.* at 63. Based upon the facts in the record, we concluded that the developer "has not proven zoning estoppel against the County according to the criteria used in states that have adopted that doctrine." *Id.*

We undertake a similar analysis here. Assuming that we would recognize zoning estoppel, we conclude that the Developers fail to satisfy the criteria utilized in jurisdictions that have recognized and applied the doctrine.

2. *The Developers Have Not Established that They Have Vested Rights or Contract Rights in the Development Approvals*

First, we note that the Developers have not acquired common law vested rights in the Development Approvals, nor have they acquired rights protected by contract.[12] With respect to common law vested rights, this Court has explained that in order to vest rights in an existing zoning use that will be protected against a subsequent change in zoning use, the owner must obtain a valid permit and undertake a substantial beginning in construction before the change in zoning has occurred. *See Prince George's Cty. v. Sunrise Dev., Ltd. P'ship*, 330 Md. 297, 307–08 (1993). Developers have no vested rights in the PUD floating zone arising from the application of the vested rights doctrine.

---

[12] We start our zoning estoppel analysis with a consideration of whether the Developers acquired vested rights, given our discussion in *Sycamore* indicating that, if we were to recognize the doctrine of zoning estoppel, we would limit its application to instances where the developer had acquired vested rights. *Sycamore Realty Co. v. People's Counsel of Baltimore Cty.*, 344 Md. 57, 67 (1996). However, we recognize the Court's more favorable attitude expressed in *MRA* where we indicated that there "may be situations in which the developer's good faith reliance on government action in the pre-construction stage is so extensive and expensive that zoning estoppel is an appropriate doctrine to apply." *Md. Reclamation Assocs., Inc. v. Harford Cty.*, 414 Md. 1, 57 (2010). In urging the Court to apply zoning estoppel under the facts of that case, the dissenting opinion, written by Judge Harrell and joined by Chief Judge Bell, argued that the two doctrines, vested rights and zoning estoppel "may exist in tandem and apply to different types of situations." *Id.* at 88 (Harrell, J. dissenting). We need not decide whether we would apply zoning estoppel irrespective of whether the Developers acquired vested rights, because once again, we are neither recognizing nor applying the doctrine under the facts of this case.

Similarly, the Developers did not acquire contractually protected development rights arising under the DRRA because it was immediately appealed.[13]  Under the terms of the DRRA, any person aggrieved by the agreement had a right to file an appeal to the Circuit Court for Frederick County within 30 days of the date on which the parties executed the agreement.  In this case, RALE and other interested persons timely filed a petition for judicial review to the circuit court.  The petition for judicial review resulted in the circuit court vacating the Development Approvals, including the DRRA.

### 3. Developers Cannot Demonstrate a Good Faith Reliance on a Development Approval Leading to a Substantial Change in Position

As was our practice in *MRA*, although Heeter and some courts treat "good faith" and "reliance" as separate elements, "we discuss them together, as they are so closely entwined."  414 Md. at 58.  We explained that given our cautious approach to the doctrine, the "burden of establishing the facts to support that theory must fall on the person or entity claiming the benefit of the doctrine."  *Id.*

---

[13] Under the Maryland DRRA statute, Md. Code., Land Use Article ("LU"), §§ 7-301 to 7-306 ("the DRRA statute"), the General Assembly has given a local governing body with zoning powers the authority to enter into an agreement with a person having a legal or equitable interest in a development, "to establish conditions under which development may proceed for a specified time."  LU § 7-301(b).  "The purpose of a DRRA is to allow developers and local governing bodies, such as a county, to negotiate terms and conditions under which development may occur."  *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 277 (2017) ("*Blentlinger*").  A DRRA permits a developer to obtain contractual rights in the development approvals and laws in effect at the time of the approval.  Under the DRRA statute, in what we have described as a "freeze provision," the statute authorizes the parties to "freeze certain laws, rules, regulations, and policies as of the time of the execution of the DRRA."  *Id.* at 277; *see* LU § 7-304(a).  "The effect of the freeze provision is that developers are able to move forward, with certainty regarding the applicable laws, with development projects that may extend over a long period of time."  *Blentlinger*, 456 Md. at 277.

41

To demonstrate their good faith reliance upon the Development Approvals, the Developers first note that "after receiving conditional approval, [they] reduced the size and number of units for the [Monrovia Town Center] project."[14] They also point out that in the DRRA and the APFO LOU, they "agreed to contribute to at least fourteen escrow accounts and to provide eight road improvements of full fee-in-lieu funding," and "also agreed to pay impact fees" totaling over $1 million and "began to pay those fees."

We are not persuaded by the Developers' attempt to characterize concessions or negotiations undertaken *prior to receiving a discretionary development approval* as evidence of good faith reliance on approvals that *they had not yet received*. When considering the Developers' concessions, it is important to keep in mind the type of development approvals being sought. The Developers are seeking the application of a discretionary floating zone that is applied as part of a lengthy, quasi-judicial process. The application, review, and approval procedures for a PUD are extensive, involving pre-application conferences, a requirement for a neighborhood meeting, Planning Commission review and public hearings, and ultimately, public hearings and final approval by the County legislative body. Frederick County Code, § 1-19-10.500. The County legislative body has discretion whether to approve or disapprove a PUD. *See* Frederick County Code, § 1-19-10.500.3 (stating that the "County Council may approve or disapprove a request for

---

[14] As part of the approval process, the total acreage of the PUD was reduced to approximately 400 acres, and the number of overall residential units was reduced to 1,250 units. The Board's granting of conditional approval was not a final approval of the project nor did the Developers secure any zoning or construction rights in the conditional approval under the Frederick County Zoning Ordinance.

rezoning of property to a Planned Unit Development District if persuaded that granting the request is appropriate and serves the public interest.").[15]  It is logical and expected that when a developer is seeking a discretionary approval, that involves the rezoning of agriculturally zoned land to enable significant development of over 1,000 housing units, that there will be negotiations and concessions by the developer.  Simply put, the Developers' negotiations and concessions that they made in an effort to secure discretionary zoning approvals do not constitute evidence of good faith reliance on development approvals that they had not yet received.

In addition to the pre-approval concessions described above, the Developers also argue that "[p]erhaps the most detrimental reliance is that the Developers conveyed to the County four acres of land for a fire station free of charge after receiving the Approvals."[16]

---

[15] The Frederick County Code establishes two sets of criteria that must be satisfied in order for an applicant to obtain PUD approval.  The first set of criteria apply within the context of the approval of a zoning amendment generally, and include:

> (1) Consistency with the comprehensive plan;
> (2) Availability of public facilities;
> (3) Adequacy of existing and future transportation systems;
> (4) Compatibility with existing and proposed development;
> (5) Population change; and
> (6) The timing of development and facilities.

Frederick County Code, § 1-19-3.110.4.  In addition to the general criteria for rezoning approval, the Code sets forth ten additional criteria that must be evaluated for the approval of a PUD.  *See id.* § 1-19-10.500.3.

[16] As evidence of this conveyance, the Developers direct us to Section 3.5 of the DRRA, where the Developers agreed to "dedicate and convey to the County, a public use site which is not less than 4.0 acres . . . for future discretionary use by the County, at or prior to the first residential plat recordation for the Project, or by November 30, 2014,

43

As noted above, after the Board of Commissioners approved the Development Approvals, RALE filed a timely petition for judicial review. As this Court has previously explained, a party that changes its position in reliance on a regulatory approval that is the subject of judicial review does so at its own risk. *O'Donnell v. Bassler*, 289 Md. 501, 508 (1981) (noting that a landowner "who obtains a permit and begins construction before the expiration of an appeal period proceeds at his own risk"). To the extent that the Developers elected to convey property to the County pursuant to a DRRA that was subject to a petition for judicial review, they proceeded at their own risk. As we noted in *MRA*, in cases where zoning estoppel has been applied by other courts where the facts involved a validly issued building permit, the court looks to whether the property owner "accelerate[d] his development or increase[d] his investment or obligations in an effort to establish such an apparent degree or amount of reliance as to prevent the rezoning." *MRA*, 414 Md. at 56, (citing Heeter*, supra*, at 77–78).

In summary, we decline to recognize or apply equitable estoppel under the facts of this case. Assuming, without deciding, that we were to recognize the doctrine, Developers have not demonstrated the elements of good faith and substantial reliance on Development Approvals, where their asserted reliance actions consist of either: prospective concessions or agreements negotiated in anticipation of receiving discretionary final development

whichever first occurs." The record does not contain any additional information concerning this conveyance.

approval; or actions undertaken at their own risk after receiving final development approval during the pendency of a judicial review proceeding.

### 4. *We Decline to Apply Equitable Estoppel Principles Based Upon the Developers' Argument that the Frederick County Ethics Statute is Ambiguous*

Finally, the Developers argue that the Ethics Statute is ambiguous, and therefore, we should apply a doctrine of equitable estoppel to prevent its application here. To support their argument, the Developers rely on *Permanent Financial Corp. v. Montgomery County*, 308 Md. 239 (1986). In that case, the Court held that a county was estopped from claiming that the fourth floor of a building exceeded the height limitations under the zoning ordinance where the applicable height provisions were determined to be ambiguous. *Id.* at 251. Applying general principles of equitable estoppel, we observed that the county shared the same interpretation of the height limit as the applicant's interpretation at the time of the issuance of the building permit, which it had consistently applied for a significant period of time. *Id.* Under the facts of the case, we concluded that, after the property owner relied upon the building permit and constructed the fourth floor in reliance on the permit, "it would be inequitable now to permit the [c]ounty to require the removal of the fourth floor." *Id.* at 252–53.

The Developers argue that the phrase "ex parte communication" is ambiguous because it is not defined in the Ethics Statute, and therefore, it would be inequitable to apply the statute in this instance. To support their ambiguity argument, the Developers assert that neither the Court of Special Appeals nor the Council could clearly define what the alleged ex parte communication actually involved, and also argue that Commissioner

45

Smith was unaware that his communications with FACT would constitute ex parte communications under the statute. We disagree with the Developers' contention that the statute is ambiguous.

If a specific term is not defined in a statute, "we determine the intended scope of the term by applying the language's natural and ordinary meaning, by considering the express and implied purpose of the statute, and by employing basic principles of common sense, the meaning these words intended to convey." *Goff v. State*, 387 Md. 327, 344 (2005) (citations omitted). The statute requires disclosure of a communication by "[a] member of the governing body who communicates ex parte with an individual concerning a pending application during the pendency of the application . . . ." GP § 5-859. The Federal Administrative Procedures Act defines the term "ex parte communication" to mean "an oral or written communication not on the public record with respect to which reasonable prior notice to all parties given . . . ." 5 U.S.C. § 551(14). Other rules and statutes similarly describe the concept of ex parte communications as applying to communications outside the presence of the parties to the proceeding. *See, e.g.*, Md. Rule 18-102.9 (a) (generally prohibiting a judge from initiating, permitting, or considering ex parte "communications made to the judge out of the presence of the parties or their attorneys, concerning a pending or impending matter"); Md. Code, State Gov't Article § 10-219(a)(1) (generally prohibiting a presiding officer in a proceeding under the Maryland Administrative Procedure Act from communicating ex parte regarding the merits of any issue in the case, while the case is pending, with a party, a party's representative, or a party's attorney, or any person who presided at a previous stage of the case).

When a governing body, such as the Frederick County Council is applying PUD standards to a particular property, it is undertaking adjudicative or administrative fact-finding. *Bucktail, LLC v. Cty. Council of Talbot Cty.*, 352 Md. 530, 548 (1999). When the legislative body undertakes the role of an adjudicatory or administrative nature, the governing body's decision-making process occurs in public, and based upon the evidence presented in the record. The public decision-making process accomplishes several objectives. Foremost, it satisfies due process concerns. Specifically, the applicant whose property is the subject of the proceeding has confidence that the decision-maker is making its decision based upon the evidence before it and is not influenced by outside communications. Similarly, it enables others who have an interest in the outcome to have an opportunity to observe the proceedings, and to participate and conduct cross-examination. Second, it ensures that the members of the decision-making body are all privy to the same information and are making their decision on the same evidence. Third, it promotes public confidence that the decision is made within the confines of a transparent and public process. For these reasons, like other quasi-judicial or administrative proceedings in other contexts, the regulation of ex parte communications has been widely extended to planning and zoning decisions. 2 Rathkopf, *The Law of Zoning and Planning*, § 32.10 (4th ed. 2018); *see, e.g.*, GP § 5-836 (generally requiring disclosure of certain ex parte communications with the Prince George's County Executive or members of the Prince George's County Council concerning a pending application for a change in rules governing the use of property).

We find no ambiguity in the provision of the Ethics Statute requiring disclosure of ex parte communications. GP § 5-859(b). It requires disclosure of ex parte communications with any individual[17] concerning a pending planning and zoning application. *Id.* We supply the common and ordinary definition to the term ex parte communication, which is any communication outside of the record of the pending proceeding. We agree with the Court of Special Appeals that "Commissioner Smith's communications with FACT were ex parte because they concerned a pending quasi-judicial proceeding in which he was one of the decisionmakers but were not part of the record of that proceeding." *RALE*, 242 Md. App. at 398–99. We will not consider an application of an estoppel doctrine based upon an asserted ambiguity in the statute.

## IV.

## Conclusion

In summary, we hold that under the plain language of the Frederick County Ethics Statute, GP § 5-862, the circuit court was not required to undertake a procedural due

---

[17] To bolster their ambiguity argument, the Developers cite to the Department of Legislative Services Note to the 2007 legislation that became the 2007 Ethics Statute. According to the fiscal note, the legislation "require[s] disclosure of ex parte communications between a Frederick County Commissioner and an *applicant* while the application is pending." *RALE*, 242 Md. App. at 402 (emphasis added). We agree with the Court of Special Appeals that the Department of Legislative Services "has no power to amend legislation to make it mean something other than what it literally says." *Id.* Moreover, we will not resort to legislative history "to seek contradiction of the plain meaning of the statute." *Duffy v. CBS Corp.*, 458 Md. 206, 229 (2018). As the intermediate appellate court succinctly stated, and we can state no better, "[t]he legislation in this case pertains to communications between a commissioner and an *individual*, and not merely an *applicant*. To the extent that the Department of Legislative Services interpreted the statute otherwise, it was wrong." *RALE*, 242 Md. App. at 402.

process analysis and to determine whether the violation of the statute violated an aggrieved party's right to notice and an opportunity to be heard. Under the plain language of the statute, the circuit court is required to determine, within the context of a judicial review proceeding, whether a violation of the Ethics Statute occurred. If the circuit court makes a factual determination that a violation occurred, its work is done, and the court "shall" remand the matter to the Frederick County governing body for "reconsideration." On remand, the statute does not provide any parameters or limitations on the type of reconsideration proceeding the County Council must undertake. Accordingly, the Frederick County Council has the discretion to determine the scope of the reconsideration proceeding. After the circuit court determined that a violation of the Ethics Statute occurred and remanded the matter to the Frederick County Council, the Council determined that it would conduct a *de novo* hearing on the Developers' application. The circuit court did not err in vacating the Development Approvals in connection with its remand order, after the Developers refused to participate in the *de novo* reconsideration proceeding.

We decline to recognize or apply zoning estoppel under the facts of this case. Assuming (without deciding) that we recognize the doctrine, the Developers have not demonstrated the elements of good faith and substantial reliance on the Development Approvals where the asserted actions in reliance on the Development Approvals consist of either: prospective concessions or agreements negotiated in anticipation of receiving discretionary final development approval; or actions undertaken at their own risk after receiving final development approval during the pendency of a judicial review proceeding. Finally, we reject the Developers' argument that the Ethics Statute is ambiguous, and that

49

it should therefore not apply under general equitable estoppel principles.  We find no ambiguity.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**